**FARMERS & MERCHANTS BANK OF PERRY v. HOWLAND et al.**

No. 17670. Opinion Filed Sept. 10, 1929.

Cress & Tebbe, for plaintiff in error.

C. G. Horner, for defendant in error Charles Howland.

JEFFREY, C. This is an action by the Farmers & Merchants Bank of Perry, Okla., against Charles Howland and John Alderson for a decree reforming four promissory notes and for judgment on the notes. The petition alleged that, prior to November 28, 1922, the defendant Alderson was engaged as a road and bridge building contractor; was indebted to the bank in the sum of $4,000, which sum was secured by a chattel mortgage on numerous items of road and bridge building machinery and equipment; that a short time prior to the above-mentioned date, the defendant Howland purchased a one-half interest in Alderson's road and bridge building business and became a partner with Alderson. It was further alleged that Alderson was badly involved and that Howland was financially responsible; and that they desired to have the bank's mortgage on the road building equipment released, and that Alderson presented a check from Howland to Alderson in the sum of $500 and five promissory notes in the sum of $700 each, and asked that the bank accept said check and notes in lieu of the note and mortgage held against Alderson; that the president of the bank observed a notation on the margin of said notes, "subject to contract of even date," and refused to take the notes, saying that he would accept Howland's notes in the place of the notes and mortgages against Alderson, but that he would only accept straight negotiable notes without limitation. The petition further alleged that Alderson then took the notes away, went to Stillwater, where Howland lived, and secured five additional notes for a like sum, which did not contain any marginal notation, but that Howland, in preparing said additional notes, blotted and scratched out with pen and ink the words on the face of the note just preceding the name of the payee, "the order of," and instructed Alderson to take the notes back to Mr. Taylor, the president of the bank, present them to him while he was busy, hold his thumb over the blotted portion of the note and advise Mr. Taylor that the notes were straight negotiable notes, and in this manner induce the bank to accept the notes and release the chattel mortgage on the road and bridge equipment. It was also alleged that Alderson did as instructed by Howland; that Mr. Taylor relied upon Alderson's statement that the notes were negotiable, accepted them, and released the chattel mortgage on the property. The petition further alleged that when the first note of the series matured, it was paid by Howland, but that since Howland and Alderson had dissolved partnership, and that although all of said notes were past due, Howland refused to pay them. Plaintiff then prayed that the notes be reformed so as to make them negotiable notes, and for judgment against Howland and Alderson for the amount of the notes. Howland answered by denying each and every allegation of the petition. Alderson defaulted, and the issues between the bank and Howland were tried to a jury resulting in a verdict in favor of Howland. The bank has appealed, and as grounds for reversal of the judgment contends that two of the court's instructions incorrectly state the law.

The first specification of error argued is the giving of instruction No. 7. That instruction is as follows:

"You are further instructed, gentlemen, that if you find and believe from the evidence that at the time the notes were negotiated and sold by John Alderson to the plaintiff bank, that the words 'or order' had been stricken from said notes and that there was no connivance or agreement between the defendants John Alderson and Charles Howland to misrepresent to said bank that said notes were negotiable in form and in fact, and that there was no intent to deceive said bank or that no misrepresentations were made, which the bank relied upon, that were false, then under such circumstances your verdict should be for the defendant on the issue of reforming the notes.

And if you further find from the evidence that John Alderson did make false representations to the plaintiff bank at the time he sold said notes to the bank and that the bank was deceived thereby and that they were false and the bank relied upon the same and acted thereon, yet if you believe from the evidence that the defendant Charles Howland did not connive with said John Alderson in said scheme, or aid and abet in the same, or have knowledge thereof, then under such circumstances your verdict should be for the defendant Charles Howland.

"Charles C. Smith, Judge."

In this connection it is contended that the trial court erroneously submitted to the jury the question of the intent of persons making a misrepresentation for the purpose of inducing a purchase of property, which intent is wholly immaterial. In other words, it is contended that the positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believed it to be true, is actual fraud. This is true, and is made so by the second subdivision of section 4996, C. O. S. 1921. Instructions limiting the liability of one misrepresenting facts to an intention to deceive have been held erroneous in a long list of cases, most of which are cited by counsel for the bank. There can be no doubt but that the holding is correct in the proper case, but, from an examination of the record in the instant case, it does not appear that the bank relied upon fraud of this character. It appears from the record that plaintiff's theory was that Howland was guilty of an intent and design to deceive the bank. Certain acts and conduct on the part of Howland with a fraudulent intent to deceive the president of the bank in order to secure the release of the mortgage are alleged in the petition. The bank's evidence was to the effect that Howland knew that he was rendering the notes nonnegotiable; that he instructed Alderson to conceal this fact from the bank and represent that they were negotiable. If the law affords a party relief under either of two sets of circumstances, but the party says, "These are the circumstances on which I rely," he should not be heard to complain if he induces the court to submit his theory of the case to the exclusion of any other which is unsupported by pleading or proof.

But aside from this, we are of the opinion that the instruction complained about is not susceptible of the exact interpretation contended for by counsel for the bank. By the instruction, it appears that the court advised the jury that Howland had a right to strike from the face of the note any words he desired so as to render the notes nonnegotiable, and, in order to make this act actionable fraud, it would be necessary to find an agreement or connivance between Howland and Alderson, or an intent to deceive the bank. The first part of the instruction is to the effect that even though the jury should find that certain words necessary to the negotiable character of the notes were stricken out, but find no connivance or agreement between Alderson and Howland to misrepresent to the bank that the notes were negotiable and no intent to deceive said bank, the mere fact that certain words were stricken out would not justify a finding that the note should be reformed. We are of the opinion that no error was committed in the giving of this instruction.

The next instruction complained of is No. 5, which reads as follows:

"You are instructed that it is an essential element in this case and it is necessary for the plaintiff to show by a preponderance of the evidence, that he not only relied upon the statements made to him by John Alderson that the notes were negotiable, if you find by a preponderance of the evidence such statements were made, but that in so relying on the same, he was using reasonable diligence in this transaction, unless he was prevented from using such diligence by the acts and conduct of the said John Alderson at said time.

"Charles C. Smith, Judge."

In connection with this assignment of error, counsel for the bank bases his argument upon the proposition that a party guilty of fraudulent conduct cannot escape the legal consequences of his fraudulent conduct by saying that the fraud might have been discovered had the party whom he deceived exercised ordinary care and diligence. It might be said, as a general rule, that the proposition states a correct rule of law. We shall now review certain portions of the evidence to ascertain whether the rule as contended for should be applied to the facts in this case.

Alderson testified as a witness for the bank by deposition that he went to see Taylor, the president of the bank, and inquired whether Taylor would accept Howland's notes in the place of the note and mortgage held against Alderson; and that Taylor advised, in substance, that he would accept Howland's negotiable notes. Alderson testified that a few days later he presented five notes in the sum of $700 each, executed

by Howland to Alderson containing the notation on the margin, "subject to contract of even date"; that Taylor refused to accept them because they contained the notation, and stated that he would only accept negotiable notes containing no restriction or limitation. Alderson took the notes to Stillwater and told Howland what Taylor had said and Howland stated that he would fix them so that Taylor would accept them. The witness says that Howland went in his house and came out with the notes executed with the words "the order of" stricken from the face of the notes, and said to Taylor, in substance, that if Alderson would present them to Taylor at a busy time, hold his thumb over the blotted portion of the note, and say that the notes were negotiable and all right, that he believed Taylor would accept them and release the mortgage. The witness states that he did as he was instructed by Howland; that Taylor agreed to take them and did so after they were indorsed by Alderson. Taylor, who had had 30 year's experience in the banking business, testified that Alderson brought the notes in while he was busy in the bank, held them up in some manner, which is difficult to understand from his testimony, and stated, in substance, that the notes contained no limitation or restriction; that they were negotiable notes; and that he accepted them and released Alderson's mortgage. One of the notes appears in the record as an exhibit, and is supposed to be an accurate representation of the manner in which the negotiable expressions were stricken from the face of the note. These words are blocked out with heavy black ink, and appear to be the most conspicuous thing on the face of the note. Taylor testified that the ink marks blocking out these words were the most conspicuous thing about the note, and that he noticed it at the time the notes were presented by Alderson, but that he did not read the notes to ascertain what words were stricken from their faces, and never knew that the words denoting negotiability had been stricken until a short time before this suit was begun. The notes were delivered to him and he had them in his hands before Alderson left the bank and probably before the release of mortgage was executed according to his testimony. All alleged acts, statements and intentions on the part of Howland tending toward the commission of a fraud were strenuously denied by him, but the question here under consideration does not call for an examination of his testimony.

Counsel cite numerous decisions from this and other courts to the effect that a vendee has a right to act on the positive representations of existent, material facts made by a vendor, even though the means of knowledge were open to him; and, in an action by the vendee for damages arising by reason of reliance on a misrepresentation of the facts, the vendee will not be precluded from recovery by reason of the fact that he did not exercise an opportunity to ascertain the facts. It is generally stated in a different manner that no one should be permitted to complain or take advantage of the fact that another has too confidently relied on the truthfulness of the statements he has himself made. Welge v. Thompson, 103 Okla. 114, 229 Pac. 271; Stevens v. Reilly, 56 Okla. 455, 156 Pac. 157, and numerous other cases. In the case of Kelly v. Robertson, 61 Okla. 85, 160 Pac. 46, where misrepresentations in connection with a land deal were under consideration, it was stated that it did not matter that the vendee acted unwisely or imprudently or whether he was negligent in not making full investigation as to the size of the building and its construction, or in seeking independent advice as to the value of the property. It is stated that the only question to be determined is, Was he deceived by the representations? From an examination of these cases, as well as numerous other cases cited by counsel for the bank, it may safely be said that none of them are authority for holding that the instruction complained of was erroneously given in connection with the evidence in this case. In none of those cases was there any evidence to the effect that the subject of sale was present; that the falsity of the representation was obvious to the complaining party at the time he claimed to have relied upon the representation made. Some of the decisions of this court probably go further than the generally accepted rule warrants, but the most that can be said of the strongest cases cited is that they hold that where one is entitled to rely upon a representation, the mere fact that he could have ascertained the truth had he pursued a means of knowledge available to him, such as examining public records pertaining to land titles, or had lands surveyed and examined its character, will not preclude a right of recovery in case he did not do so. Where representations are made by the vendor, the vendee is not required to make an independent investigation to determine the truth or falsity of the representations. It is elementary that to be actionable, a repre-

sentation must be of such nature and made under such circumstances that the injured party had a right to rely upon it. Ryan v. Batchelor, 95 Ark. 375, 129 S. W. 787; Ross et al. v. Bolte et al., 165 Iowa, 499, 146 N. W. 31. 26 C. J. 1141, after stating that in some jurisdictions the question on which liability turns is not whether a person of ordinary prudence would have been deceived but whether plaintiff was deceived, and that the person deceived by representations may recover notwithstanding he was negligent in relying thereon, proceeds as follows:

"But even in such jurisdictions recovery will be denied where plaintiff could have discovered the falsity of the representations by the use of his senses and judgment or by the exercise of ordinary powers of observation."

14 Am. & Eng. Ency. of Law, after stating that one who, having eyes, will not see matters directly before them, where no concealment is made, will not be entitled to favorable consideration when he complains that he has suffered from his own voluntary blindness, and has been misled by over-confidence in the statements of the other, concludes at page 117 with the following:

"This doctrine is not based upon any consideration for the party who has been guilty of the false representations, but upon the ground that public policy requires that persons shall be required to exercise at least ordinary prudence in their business dealings. instead of calling upon the courts to relieve them from the consequences of their inattention and negligence."

In Linington v. Strong, 107 Ill. 295, it is stated that misrepresentation, which will vitiate a contract, must relate to a matter respecting which the complaining party did not possess at hand the means of knowledge as to the facts. Where the means of knowledge are at hand equally available to both parties, and the subject of purchase is present and alike open to their inspection, and the purchaser refuses to exercise his powers of observation and see matters that are directly before him, he will not receive favorable consideration when he complains that he suffered from his own voluntary blindness.

The case of Jacobsen v. Whitely, 138 Wis. 434, 120 N. W. 286, deals with both classes of cases and differentiates the two rules which seems to have caused considerable confusion. It is there stated:

"The rule of law is well established that a purchaser is not justified in relying upon the statements of the seller when their falsity is obvious to him, but this does not require that he shall meet every positive statement with incredulity and must search to ascertain whether it is false. The law recognizes the duty of each to refrain from even attempted deceit of another with whom he deals, and the right of the latter to assume that he will do so. It is an unsavory defense for a man, who by false statements, induces another to act to assert that if the latter had disbelieved him he would not have been injured. * * * Nevertheless, courts will refuse to act for the relief of one claiming to have been misled by another's statements who blindly acts in disregard of knowledge of their falsity or with such opportunity that by the exercise of ordinary observation, not necessarily by search, he would have known. He may not close his eyes to what is obviously discoverable by him. (Cases cited). It is in this sense only that opportunity to know the truth will prevent recovery for deceit. Whether the situation presents or fails to present such opportunity is usually a question of fact."

The element of negligence and voluntary blindness on the part of the president of the bank according to his own testimony enters so strongly into the transaction that it is difficult to see how it can escape attention under any sane rule of law or equity. To illustrate with an extreme case, suppose that A. owned a white horse and desired to purchase another of the same color and type. B., having learned of A.'s desire to buy such a horse, comes forward and states that he has a horse that suits the description of the horse desired and offers to sell the horse to A. for the price offered. If B. leaves his horse at home and makes a positive representation of the kind and character of horse he has for sale, under the authorities relied upon by counsel for the bank, A. is justified in relying upon the representations made, even though he had an opportunity to go a short distance, examine the horse and ascertain from patent defects that B.'s representations were false. The fact that A., knowing that he had means of ascertaining the truth of the representations but did not do so, would not preclude his right of recovery in an action for damages resulting from misrepresentations made by B. But if B. brings the horse into the presence of A., and states that he has a horse suiting the description furnished, while as a matter of fact the horse is of another color, but A. relies upon the representations made by B., and refuses to look at the horse and ascertain the truth by the mere use of his powers of observation, certainly it could not be said, as a matter of law, that A. did all that was required of him, and that he was entitled under the circumstances to rely up-

on the representations made by B. As remarked by counsel for defendant, any other rule would place a premium upon negligence and voluntary blindness, and the rule is well settled that neither is favored by law or equity. Under the facts of the case, the instruction only required of the president of the bank that he open his eyes and see that which was plainly before them, and excused him of this requirement in the event they should find that he was prevented from doing so by the acts or conduct of Alderson. We think the instruction correctly stated the law as applicable to the facts of this case. The judgment of the trial court is affirmed.

BENNETT, HERR, DIFFENDAFFER, and HALL, Commissioners, concur.

By the Court: It is so ordered.