In re Roger K. IVERSON, Debtor.

JOHN DEERE COMPANY, a corporation, and Taylor Farm Service, a Utah corporation, Plaintiffs,

v.

Roger K. IVERSON, Defendant.

Bankruptcy No. 82C–02921.
Civ. No. 83PC–3128.

United States Bankruptcy Court,
D. Utah.

June 20, 1986.

Theodore Boyer, Jr., Clyde, Pratt, Gibbs & Cahoon, Salt Lake City, Utah, for Taylor Farm Service.

Danny C. Kelly and Caryn Beck-Dudley, Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, Utah, for John Deere Co.

Michael N. Zundel, Roe, Fowler & Moxley, Salt Lake City, Utah, for Roger K. Iverson.

## JURISDICTION

GLEN E. CLARK, Bankruptcy Judge.

This matter came before the court for trial on plaintiffs' complaint to determine the dischargeability of a debt pursuant to § 523(a)(2)(B) of the Bankruptcy Code. The Court has jurisdiction over the subject matter of and parties to this adversary proceeding pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference of the United States District Court for the District of Utah dated July 10, 1984, entered pursuant to 28 U.S.C. § 157(a). This proceeding to determine the dischargeability of a debt is a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2)(I).

## CLAIMS OF THE PARTIES

Plaintiffs contend that the defendant, either intentionally or recklessly, caused to be published materially false representations on four financial statements, by stating that (1) he had assets which he did not actually own; (2) his liabilities were considerably less than their actual amount; and (3) his net worth and overall financial condition were much better than they actually were. In addition, plaintiffs contend that the defendant traded in and/or used as additional security equipment which was subject to other liens, contrary to the defendant's representations that he owned such equipment free and clear from all liens. Furthermore, plaintiffs allege that the defendant represented that he had a business or credit association with Iverson Brothers, a partnership having a sound credit history and reputation, when in fact defendant had no such association.

Defendant admits that the financial statements contain falsities, but contends that the debt to plaintiffs is dischargeable because he did not cause materially false statements to be published with the intent to deceive, and the plaintiffs did not reasonably rely on the financial statements.

## FACTS

John Deere Company ("John Deere"), plaintiff-creditor, is a manufacturer of farming equipment authorized to do business in the state of Utah. Taylor Farm Service ("Taylor"), plaintiff-creditor, is a dealer and distributor of farming equipment manufactured by John Deere, doing business in the state of Utah, with its principal place of business in Tremonton, Box Elder County, Utah. Roger K. Iverson ("Iverson"), defendant-debtor, is an individual residing in Tremonton, Box Elder County, Utah, who, on February 25, 1983, filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. His Chapter

11 case was subsequently converted to a case under Chapter 7. At all times material hereto, Iverson was engaged in the business of harvesting grain and other crops for farmers. This business is commonly referred to as "custom cutting".

Between August 5, 1980, and April 14, 1982, Taylor sold various items of farming equipment to Iverson, including four grain combines and a windrower manufactured by John Deere. In each case, the sales were made by use of an installment contract requiring annual payments over a specified number of years. The four separate transactions Iverson had with Taylor and John Deere are as follows:

(1) On or about August 5, 1980, Iverson executed a Purchase Order, Security Agreement[1], Purchaser's Financial Statement and UCC–1 financing statement in connection with the purchase of a John Deere 6600 Sidehill Combine, Serial No. 255945. As additional security, Iverson granted Taylor and John Deere an interest in a 7700 Combine with 20' Platform, Serial No. 216283. The total amount Iverson owed John Deere for this equipment purchase, including finance charges, was $50,551.25.

(2) On or about January 29, 1981, Iverson executed a Purchase Order, Security Agreement, Purchaser's Financial Statement and UCC–1 financing statement in connection with the purchase of a John Deere 6600 Sidehill Combine, Serial No. 225900. As additional security, Iverson granted Taylor and John Deere an interest in a John Deere 6600 Combine, Serial No. 108441. The total amount Iverson owed John Deere for this equipment purchase, including finance charges, was $56,049.32.

(3) On or about July 23, 1981, Iverson executed a Purchase Order, Security Agreement, Purchaser's Financial Statement and UCC–1 financing statement in connection with the purchase of a John Deere 8800 Combine, Serial No. 464767, and a John Deere 22' Platform, Serial No. 483272. In connection with the purchase, Iverson traded in a John Deere 6600 Combine, Serial No. 108441, and a John Deere 7700 Combine, Serial No. 315560. The total amount Iverson owed John Deere for these equipment purchases, including finance charges, was $91,209.17.

(4) On or about April 14, 1982, Iverson executed a Purchase Order, Security Agreement, Purchaser's Financial Statement and a UCC–1 financing statement in connection with the purchase of a John Deere 2280 Windrower, Serial No. 560562, and a John Deere 230 14' Platform, Serial No. 5628581. As additional security, Iverson granted Taylor and John Deere a security interest in a John Deere 643 6–Row Cornhead, Serial No. 336933. The total amount Iverson owed John Deere for these equipment purchases, including finance charges, was $33,600.24.

Each Security Agreement and UCC–1 financing statement was executed in favor of Taylor and subsequently assigned by Taylor to John Deere. Each Purchaser's Financial Statement was executed with the knowledge that it would be relied upon by John Deere in extending credit and the completion of the Purchaser's Financial Statement was necessary to obtain financing for the purchase of equipment. Each Purchaser's Financial Statement executed by Iverson in connection with the purchase of the farm equipment contained materially false representations. These false representations included the following:

(1) The August 5, 1980 Purchaser's Financial Statement represented that Iverson

---

1. On each executed security agreement, Iverson covenanted that the pieces of equipment traded in or used for additional security were free and clear of all liens and encumbrances. Had John Deere conducted a search of the security agreements recorded with the State of Utah, it would have discovered that four of these pieces of equipment were encumbered. This information would have alerted John Deere that further investigation was needed to verify the truthfulness and accuracy of other information provided by Iverson. However, because John Deere fundamentally relied on the financial statements submitted by Iverson, and because these statements contained information on them which warranted further investigation, the false claims made on the security agreements need not be discussed.

owned 196 acres of real property valued at $350,000, and that he was renting an additional 784 acres. Actually, Iverson owned only one acre of real property and was renting only 300 to 350 acres. Iverson listed in the liabilities section of the statement that he had outstanding bank loans totalling $13,000, but he actually owed approximately $32,000. In addition, Iverson had other liabilities which he did not include on the financial statement. If Iverson had listed all of his liabilities, they would have totalled approximately $120,000 to $140,000, rather than the $60,000 stated. The $4,500 cash asset listed on the statement was not actually cash, but instead represented uncollected accounts receivable. Finally, Iverson noted that the purchased equipment was to be used for his own use rather than for custom harvesting.[2]

(2) The January 29, 1981 Purchaser's Financial Statement indicated that Iverson owned 640 acres of real estate valued at $1,728,000. Actually, Iverson owned only the same one acre of land on which his home was situated. The loan applicant on this statement was identified as both Roger Iverson and Iverson Brothers. This was a false representation as Roger Iverson was not involved in any way with Iverson Brothers. Furthermore, Iverson noted that the purchased equipment was to be used for his own use rather than for custom harvesting.

(3) The July 23, 1981 Purchaser's Financial Statement indicated that Iverson owned 1,286 acres of real estate valued at $2,650,000. Again, Iverson owned only one acre of land. The named loan applicant on this statement was Iverson Brothers alone, but Roger Iverson signed the statement as an individual. Iverson also noted falsely that the purchased equipment was to be used for his own use rather than for custom harvesting.

(4) The April 14, 1982 Purchaser's Financial Statement indicated that Iverson owned real property valued at $380,000. Iverson had an option to purchase the land, but he did not own it. All Iverson owned was the one acre he had owned all along. The liabilities on this statement were understated by $137,000, which included debts owed to Golden Spike State Bank ($50,000), International Harvester Company ($30,000), and First Security Bank ($57,000). Iverson again noted that the purchased equipment was to be used for his own use rather than for custom harvesting.

A representative of John Deere testified that two ratios are used to evaluate the credit-worthiness of a credit applicant, assets-to-liabilities and equipment purchase-to-net worth. In order to meet John Deere's requirements, an applicant must have a 2:1 asset-to-liability ratio, and a 1:4–5 equipment purchase-to-net worth ratio.

Prior to the sales of equipment at issue in this proceeding, Taylor knew that Iverson was engaged in the business of custom cutting; however, Iverson and Taylor represented to John Deere that Iverson purchased the equipment for his own use only. In addition, Taylor assisted Iverson in misrepresenting information that it knew would aid Iverson in obtaining credit from John Deere and on at least one occasion added the name "Iverson Brothers" to the statement. Taylor also did not demonstrate reasonable care in its dealings with Iverson. Not only did Taylor's agent, on at least one occasion, bring the financial statement to Iverson to be completed while Iverson was working in the field, but Taylor made no effort to verify the accuracy of the statements made by Iverson prior to the various sales of equipment at issue in this proceeding.

Subsequent to obtaining the property from Taylor and John Deere, Iverson defaulted on his obligation under each of the

---

**2.** A section on each of John Deere's financial statement forms requires the applicant to check a box indicating whether the equipment is to be used for "own" or "custom" work. "Custom cutting" refers to the business of harvesting grain and other crops for farmers. John Deere accepts a smaller down payment if the purchase is for the purchaser's own use rather than for custom harvesting.

Security Agreements. As of June 28, 1984, Iverson was indebted to John Deere in the amount of $179,834.29.

## DISCUSSION

Section 523(a)(2)(B) of the Bankruptcy Code excepts from discharge certain debts incurred by use of a false written statement respecting the debtor's or an insider's financial condition. To meet its burden of proof, a creditor must show by clear and convincing evidence that the debtor (1) obtained money, property, credit, or services; (2) by using materially false written, statements respecting the debtor's or an insider's financial condition; (3) with the intent to deceive; and (4) upon which the creditor reasonably relied to advance the money, property, credit, or services. *North Park Credit v. Harmer (In re Harmer)*, 61 B.R. 1, 4 (Bkrtcy.D.Utah 1984). *See In re Black*, 787 F.2d 503, 505, Bankr.L.Rep. (CCH) Para. 71,050, at Para. 88,701 (10th Cir.1986); *Matter of Archer*, 55 B.R. 174, 178, 13 B.C.D. 967 (Bkrtcy.M.D.Ga.1985); *In re Day*, 54 B.R. 570, 572 (Bkrtcy.D. Mass.1985).

### I.

### *Use of Financial Statements to Obtain Credit to Buy Property*

It is undisputed that Iverson submitted financial statements to Taylor and John Deere on five separate occasions between September 25, 1978 and April 14, 1982, of which the later four statements are relevant to this proceeding. The September 25, 1978 financial statement was not relied on in extending credit to Iverson on the 1980 purchase of equipment. The August 5, 1980 statement was the source for financial information on the 1980 transaction. It is also undisputed that as a result of submitting these four financial statements, Iverson received property from Taylor and was extended credit by John Deere.

### II.

### *Materially False Financial Statements*

■ A materially false financial statement is one which paints a substantially untruthful picture of the debtor's financial condition by misrepresenting information of the type which would normally affect the decision to grant credit. *In re Harms*, 53 B.R. 134, 140 (Bkrtcy.D.Minn.1985); *In re Denenberg*, 37 B.R. 267, 271 (Bkrtcy.D. Mass.1983); *In re Hunt*, 30 B.R. 425, 440, Bankr.L.Rep. (CCH) Para. 69, 195 (Bkrtcy. M.D.Tenn.1983). The information must not only be substantially inaccurate, but it must also be information which affected the creditor's decision making process. *In re Hansen*, unpublished memorandum opinion and order, No. 83PC–0010 at 32 (Bkrtcy.D.Utah Feb. 26, 1986); *In re Hunt*, *supra*, 30 B.R. at 440. It has been held in a long line of cases that the omission, concealment, or understatement of any of the debtor's material liabilities constitutes a "materially false" statement. *In re Harmer*, *supra*, 61 B.R. 1, 5. *See In re Norton*, 11 B.R. 141, 144 (Bkrtcy.D.Vt.1980).

■ It is clear that the financial statements given to Taylor and John Deere by Iverson contained materially false representations pertaining to Iverson's financial condition. Contained in Iverson's four financial statements were false representations pertaining to (1) the identity of the party actually making the equipment purchase, *i.e.*, Roger Iverson or the Iverson Brothers partnership; (2) the intended use for the equipment, *i.e.*, own or custom use; (3) the actual assets of the defendant, *i.e.*, mischaracterizing accounts receivable as cash, and claiming ownership to large and varying acreages of real estate when only one acre of land was ever owned by Iverson; and (4) the actual liabilities owed, *i.e.*, not listing substantial amounts of liabilities owed to other creditors.

### III.

### *Intent to Deceive*

■ The fundamental purpose of the intent to deceive element is to assure that only the debtor who dishonestly obtains money, property, credit, or services be punished with denial of discharge, and that the

honest, though mistaken, debtor be protected. *In re Hansen, supra,* at 37; *In re Drewett,* 13 B.R. 877, 880 (Bkrtcy.E.D.Pa. 1981). "[It] must be shown that the debtor's alleged false statement in writing was either knowingly false or made so recklessly as to warrant a finding that he acted fraudulently." 3 COLLIER ON BANKRUPTCY Para. 523.09[5][b], at 523–69 (15th ed. 1985). The requisite intent may be inferred from a sufficiently reckless disregard of the accuracy of the facts. *In re Black, supra,* 787 F.2d at 506. Intent to deceive may also be inferred where the debtor knew or should have known of the falsity of the statement. *In re Hansen, supra,* at 37; *In re Delano,* 50 B.R. 613, 619 (Bkrtcy.D.Mass.1985); *In re Denenberg, supra,* 37 B.R. at 271. If the creditor has proved all other elements of § 523(a)(2)(B), the element of intent will be presumed and will not be rebutted by the debtor testifying that he or she did not intend to deceive the creditor. *In re Drewett, supra,* 13 B.R. at 880; *See In re Harmer, supra.*

■ Based on the number and nature of false representations contained in Iverson's financial statements, the Court is persuaded that Iverson knew he was misrepresenting his financial position to the plaintiffs, if not to Taylor, then at least to John Deere. Iverson did not mistakenly provide Taylor and John Deere with false information, but instead intentionally or recklessly made the false representations in order to obtain the sale of equipment by Taylor and the extension of credit by John Deere.

## IV.

### Reasonable Reliance on the Financial Statements

The final element which a creditor must prove in order to have a debt found nondischargeable is that the creditor both actually *and* reasonably relied upon the financial statement(s) in extending credit to the debtor. *In re Harms, supra,* 53 B.R. at 140; *In re Denenberg, supra,* 37 B.R. at 271.

### A. *Actual Reliance*

■ The Court found at trial that Taylor did not meet its burden of showing by clear and convincing evidence that it relied on Iverson's financial statements in selling Iverson farm equipment. Evidence at trial suggested that not only did Taylor know or have reason to know of the false information in the financial statements, but on some occasions even assisted Iverson in falsifying the information.

■ The Court also found that John Deere relied on Iverson's financial statements in extending credit to Iverson to enable him to pay his debts to Taylor. John Deere's credit policy requires that a financial statement be submitted before financing is approved. In some instances financial information is given over the phone and approval granted, but this approval is always given subject to receipt of the financial statements. As a result, this Court is satisfied that John Deere actually relied on the debtor's financial statements.

### B. *Reasonable Reliance*

In addition to relying on a debtor's financial statement(s), a creditor must also show that the reliance was reasonable. " '[R]easonableness' requires that representations must be found to be of such a character that a reasonably prudent person would rely on them. Such a standard fosters a responsible and careful use of solicited financial statements and discourages the 'spurious use' of such statements." *Matter of Newmark,* 20 B.R. 842, 862 (Bkrtcy. E.D.N.Y.1982), *quoting In re Magnusson,* 14 B.R. 662, 668–69 n. 1, 8 B.C.D. 708 (Bkrtcy.N.D.N.Y.1981).

Courts have recognized four categories of cases where a creditor's reliance on a false financial statement is not reasonable: (1) where the creditor knows at the outset that the financial statement is not accurate, *see In re Houk,* 17 B.R. 192 (Bkrtcy.D.S.D. 1982); (2) where the financial statement contains insufficient information to present an accurate portrait of the debtor's financial condition, *see In re Isaacs,* 15 B.R. 210 (Bkrtcy.S.D.Ohio 1981); (3) where the credi-

tor's own investigation reveals the likelihood that the debtor's financial statement is false or incomplete, *see In re Smith*, 2 B.R. 276, 5 B.C.D. 1265 (Bkrtcy.E.D.Va. 1980); and (4) where the creditor fails to independently verify any of the information contained in the financial statement, *see In re Breen*, 13 B.R. 965 (Bkrtcy.S.D.Ohio 1981). *In re Harms, supra*, 53 B.R. at 140–41; *In re Price*, 48 B.R. 211, 213, 12 C.B.C.2d 690 (Bkrtcy.S.D.Fla.1985).[3]

The first two categories of cases where reliance is not reasonable clearly do not apply in the present case. John Deere did not know at the outset that the financial statements were inaccurate, and the financial statements provided adequate information to enable John Deere to evaluate the financial position of the creditor. The third category does not apply in this case because an independent investigation which may have led to information revealing the likelihood of false or incomplete information did not take place.

The fourth category of cases where the creditor's reliance is not considered reasonable, however, bears directly on the decision in this case because various items contained on Iverson's four financial statements required further investigation. John Deere has failed to show this Court (1) that a reasonably prudent person would have relied on all of the representations made on Iverson's financial statements without further investigation; (2) that John Deere was within company *and* industry standards in its evaluation of the debtor's credit-worthiness; and (3) that surrounding circumstances existing at the time of the applications for credit affected the decision whether to independently investigate.[4]

▮▮▮ Generally, a creditor is not obligated to make an independent investigation of a loan applicant's financial condition where the financial statement is accurate or complete on its face, unless the creditor's normal business practice requires that such an investigation be made. *In re Day, supra*, 54 B.R. at 573. However, it is well settled that a "creditor has a duty to make a reasonable effort to check the credit rating of the Debtor and not rely upon just the financial statement." *In re Price, supra*, 48 B.R. at 213; *In re Brown*, 55 B.R. 999, 1004 (Bkrtcy.E.D.N.Y.1986); *In re Breen, supra*, 13 B.R. at 213. In addition, it is not reasonable merely to rely on mathematical ratios calculated from information contained in the statements, without also comparing the current information with data contained on previously submitted statements in the creditor's possession. *In Matter of Bonanza Imports & Export, Inc.*, 43 B.R. 577, 578–79 (Bkrtcy.W.D.Wis. 1984). When previously submitted financial statements are available, it is only reasonable to compare the information contained on them. *In re Pappas*, 23 B.R. 715, 717 (Bkrtcy.D.Kan.1982).

In this case, the existence of inconsistent information in each financial statement, the lack of legibility of some of the entries, the mathematical errors contained on three of the four statements, and the amount of money John Deere was loaning Iverson in each transaction, imposed upon John Deere the duty of additional investigation. The four financial statements contained enough inconsistencies to mandate investigation by a reasonably prudent person, and this process of verification could have been accomplished without substantial effort or expense to John Deere. The court now turns to its examination of each statement.

1. *First Financial Statement.* The first relevant financial statement, dated August 5, 1980, resulted in a loan in the amount of $50,551.25. This statement does

---

**3.** The court in *In re Harms, supra*, 53 B.R. at 141 n. 3, observed that the fourth approach "appear[s] to impose the duty of independent verification of entries on a financial statement on the creditor regardless of whether the creditor had cause to suspect them [to be] false or not. The Court has reservations whether the Bankruptcy Code can be construed to impose such a burden

where individual or industry practice do not already require it." The court was not required to decide whether the fourth approach was an appropriate one to make, and therefore did not endorse or adopt it.

**4.** *See* text at Part V, *infra.*

not contain on its face information which would have automatically alerted the John Deere employee making the credit evaluation of the need to conduct an independent investigation of the information contained on the statement, but three facts made it unreasonable to accept the representations without some type of investigation.

John Deere had previously obtained a financial statement from Iverson on September 25, 1978, which could have been used to compare the information contained on the August, 1980 financial statement. By comparing these two financial statements, and later, comparing the other statements which had been submitted by Iverson, John Deere would have been alerted that some of the representations were false. An early and often cited commentator noted,

A creditor who ignores available information or who fails to seek information from sources that are commonly used, should not be heard to complain about the debtor's fraud. It is the creditor's failing to comport with normal business practices, not the debtor's fraud, that is the true cause of the loss.

Zaretsky, *The Fraud Exception to Discharge Under the New Bankruptcy Code,* 53 Am.Bankr.L.J. 253, 262 (1979).

It was not John Deere's policy to compare financial statements, yet it seems reasonable to do so, especially when warning signs exist. Past financial statements in the creditor's possession are clearly available information which should be used to evaluate later statements, especially when questions arise regarding the truthfulness and accuracy of information contained in the statements.

If John Deere had compared the 1978 and 1980 statements it would have discovered that within two years Iverson claimed to have increased his total assets by $264,-500, and decreased his total liabilities by $13,000, on yearly net income ranging from $32,000 in 1977 to $61,000 in 1980 (*see* Appendix A). In addition, the fact that the figure for autos and trucks claimed to be owned by Iverson was written so illegibly

that John Deere would have had to calculate the figure using the total assets figure causes some concern. A further, though less conclusive, consideration found on the face of the statement is that Iverson was relatively young (29 years old), with 1979 net earnings of $61,000, yet he claimed he owed nothing on his real estate purported to be worth $350,000. This later consideration is not conclusive in itself because a variety of reasons could explain his wealth, *e.g.,* inheritance, but combined with the other factors it seems only reasonable to inquire.

An investigation might have taken the form of (1) calling Taylor or Iverson to verify the exact location of the property, and if circumstances warranted it, make a title search and/or verify that the property was owned outright by Iverson; (2) checking with Taylor or Iverson on the correct asset figure for the autos and trucks; (3) verifying that all recorded financing statements were included as liabilities on the financial statement; and (4) obtaining a credit report on Iverson.

The warning signs contained on the first financial statement and the investigation which would have resulted may not have alerted John Deere to *all* of the false representations on the statement, *e.g.,* the fact that the equipment would be used for custom rather than his own use, but most would have been easily discovered. John Deere would likely have learned (1) that Iverson owned only one acre of land, and that the equipment was intended for custom cutting; (2) that he owed the bank approximately $32,000, rather than $13,000; (3) that his total liabilities were approximately $120,000 to $140,000; and (4) that the listed $4,500 cash asset actually represented uncollected accounts receivable.

2. *Second Financial Statement.* The second financial statement, dated January 29, 1981, contained more warning signals than the first statement, yet an independent investigation was again not conducted. The named applicants on this statement were Roger Iverson *and* Iverson Brothers, a partnership of two of Iverson's older

brothers, in which Roger Iverson had no interest. The first warning signal to John Deere on this statement was that the partnership was involved in the purchase of the equipment, yet Roger Iverson signed the financial statement as an individual. In addition, Iverson's net income decreased from $61,000 in 1979 to $56,000 in 1980, yet he claimed his property ownership increased from 196 acres of land in 1980 to 640 acres in 1981 (*see* Appendix A). Also, in the five months since the previous financial statement had been submitted and the equipment purchased, total assets increased by $1,546,000, yet total liabilities increased by only $387,800. Finally, the total assets figure, reflecting $2,08750.00, was missing a zero; · the total liabilities figure contained a mathematical error resulting in the liabilities being understated by $270,000; and the amount owed to John Deere had to be calculated using the total liabilities figure because the number was unclear on the statement.

Because of the significant changes in property ownership and total assets and liabilities, with income remaining relatively unchanged, investigation by John Deere was warranted. John Deere may have felt that the significant changes in property ownership, assets, and liabilities were attributed to the addition of "Iverson Brothers" as an applicant, but the fact that a business entity was now involved did not relieve John Deere of its burden to investigate. Instead, the addition of the partnership would facilitate an investigation by providing additional information sources with which to check the accuracy of the statement. Making a phone call to the partnership or obtaining a credit report would have informed John Deere that Roger Iverson was not a partner in the partnership and that caution was required to process his credit application.

John Deere's policy of corresponding with the dealer when mathematical errors are contained on the financial statement did not appear to be followed in this instance. In addition, inquiry was not made about two mathematical mistakes contained on the July, 1981 and April, 1982 statements.

John Deere may have felt that correspondence with Taylor was unnecessary since the increase in liabilities after· the errors were corrected would not have made a difference in the decision to grant credit, because the assets-to-liabilities, and equipment-purchase-to-net-worth guidelines were met in either case (*see* Appendix A), but the errors of $270,000, $500, and $0.10, respectively, would have at least alerted John Deere that the statements were not completed with great care and that further investigation was warranted.

Again, an investigation may not have alerted John Deere to every false representation on the January, 1981 statement, but it would have warned the creditor of those representations which had the greatest impact on its decision to grant credit, namely, the debtor's assets, liabilities and net worth.

3. *Third Financial Statement.* The third financial statement, dated July 23, 1981, also had warning signals calling attention to likely false representations. The July, 1981 financial statement was made six months after the previous statement, yet (1) real property ownership more than doubled, from 640 acres in January, 1981 to 1,286 acres in July, 1981; (2) total assets increased from $2,087,500 in January, 1981 to $3,248,000 in July, 1981; and (3) total liabilities curiously decreased from $447,-800 in January, 1981 to $339,500 in July, 1981, at a time when Iverson's 1980 net income was stated as $45,000, some $11,000 less than what was shown for 1980 income in the January statement. A further discrepancy on this statement is that Iverson Brothers is listed as the only applicant on the financial statement, yet Roger Iverson again signed the statement as an individual, not as an agent of the partnership. Finally, the amount owed to John Deere, $86,000, must be calculated using the total liabilities figure because it is written so illegibly, and also there is a mathematical error of $500 for the total liabilities amount.

The methods of investigating the previous two statements would likewise facili-

tate the evaluation of this statement. By investigating the Iverson Brothers partnership, the land ownership, and the recorded financing statements, the major false representations would have been discovered and John Deere would not have extended credit to Iverson.

4. *Fourth Financial Statement.* The fourth and final financial statement, dated April 14, 1982, also contained a number of warning signals calling attention to likely false representations. The first warning signal was that Roger Iverson was the only applicant on this statement, when in the previous two statements Iverson Brothers was either a co-applicant or the sole applicant. At some point Roger Iverson's two older brothers informed Taylor that Roger did not have an interest in the partnership, which resulted in sales no longer being made to Iverson using the partnership's name. The next warning signal was that Iverson now claimed to own real property valued at $350,000, when he actually owned only the one acre he had owned all along. The third major false representation was that $137,000 in liabilities were not listed on the financial statement. Debts to Golden Spike State Bank ($50,000), International Harvester Company ($30,000), and First Security Bank ($57,000) were not mentioned anywhere on the statement. Finally, Iverson claimed that the property would be used for his own rather than custom use, and a minor mathematical error ($0.10) is contained on the statement.

Had John Deere compared the April, 1982 financial statement with previous financial statements, investigated the location and ownership of the listed real property, and conducted a search of financing statements recorded with the State of Utah, it would have found that Iverson's statement contained egregiously false information, and credit would not have been extended to him.

## V.

*The Emerging Reasonableness Standard*

In addition to the four categories of cases where a creditor's reliance on a false financial statement is not reasonable, a standard of reasonableness is emerging which requires the court to measure the creditor's actual conduct in the particular case against three different factors: (1) the creditor's standard practices in evaluating credit-worthiness; (2) the standards or customs of the creditor's industry in evaluating credit-worthiness; and (3) the surrounding circumstances existing at the time of the debtor's application for credit. *In re Harms, supra,* 53 B.R. at 141. Courts generally do not seek to prescribe procedures for the evaluation of credit-worthiness, but where a creditor's procedure does not comport with industry standards, or where warning signals suggest that independent investigation of a debtor's representations is appropriate, the court may suggest ways to improve the credit evaluation process. *In re Hames,* 53 B.R. 868, 872 (Bkrtcy.D.Minn.1985).

The standards used by John Deere to evaluate the financial statements, specifically assets-to-liabilities ratio (2:1) and equipment-purchase-to-net-worth ratio (1:4–5), were introduced into evidence and were clearly followed in the evaluation process (*see* Appendix A). However, if the statements had truly reflected Iverson's financial position the required ratios would not have been satisfied. The credit evaluation standards for the farm equipment industry were not introduced into evidence, so the Court cannot determine if John Deere followed industry standards when it chose not to compare financial statements and make independent investigation into the truthfulness of the information. Nor did John Deere present evidence regarding surrounding circumstances existing at the time of Iverson's applications that could have had a bearing on the reasonableness issue. Therefore, the failure to conduct *any* investigation in light of the many obvious warning signals which appeared either on the face of the statements or which are revealed when the statements are compared, satisfies this Court that John

Deere's reliance was not reasonable. The fact that Iverson had a good credit history with Taylor has no bearing on the reasonableness issue because reliance upon that fact, while ignoring the warning signals contained on the statements, would mean that John Deere did not rely on the financial statements, but instead relied on Iverson's past relationship with Taylor.

## CONCLUSION

In view of the foregoing discussion, it must be concluded that the debtor caused to be published materially false written statements about his financial position with intent to deceive John Deere, and to a limited extent, Taylor. It is clear that John Deere relied on the financial statements in extending credit to Iverson; however, Taylor did not rely on the financial statements when it sold equipment to Iverson. It is the failure of John Deere to conduct *any* investigation in view of *all* of the warning signals contained on the financial statements which compels the Court's conclusion that John Deere has not sustained its burden of proving that it reasonably relied on Iverson's financial statements when it provided financing for the equipment purchases. Accordingly, the debt to John Deere and Taylor is determined to be dischargeable.

The foregoing constitutes the court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052. Counsel for the debtor shall prepare and submit an appropriate form of judgment in accordance with Local Rule 13.

APPENDIX A

COMPARISON OF THE ROGER IVERSON FINANCIAL STATEMENTS

|  | Financial Statement Sept. 25, 1978 | Financial Statement Aug. 5, 1980 | Financial Statement Jan. 29, 1981 | Financial Statement July 23, 1981 | Financial Statement April 14, 1982 |
|---|---|---|---|---|---|
| Applicant Name | Roger Iverson | Roger Iverson | Iverson Brothers & Roger Iverson | Iverson Brothers | Roger Iverson |
| Social Security Number | na | 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 | 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 | 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 | 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 |
| Equipment Use | own | own | own | own | own |
| Business· | individual | individual | individual | individual | individual |
| Net Income for Last Year | 32,000 | 61,000 | 56,000 | 45,000 | 35,000 |
| Other Income per Month | 1,400 | 2,000 | 2,500 | 3,000 | 2,500 |
| Real Estate Owned (Acres) | 260 | 196 | 640 | 1,286 | —— |
| Real Estate Rented (Acres) | 150 | 784 | — | — | 400 |
| Crops (Acres/Income): |  |  |  |  |  |
| Barley | 70/18,000 | 480/120,000 | — | 200/100,000 | 250/25,000 |
| Beets | 25/10,000 | — | — | — | —— |
| Corn | —— | 300/111,000 | 220/110,000 | 200/75,000 [a] | 100/14,000 |
| Hay | — | — | —— | 90/47,500 | 75/12,000 |
| Wheat | 250/24,000 | 200/79,000 | 420/210,000 | 250/120,000 | 300/36,000 |
| ASSETS: |  |  |  |  |  |
| Harvested Crops for Sale | 15,000 | 12,000 | 0 | 0 | —— |
| Farm Equipment | 35,000 | 130,000 | 270,000 | 475,000 | 340,000 |
| Autos and Trucks | 20,000 | 45,000 [a] | 75,000 | 95,000 | 125,000 |
| Cash | 10,000 | 4,500 | 10,000 | 18,000 | 12,000 |
| Stocks and Bonds | — | — | 4,500 | 10,000 | —— |
| Real Estate | 197,000 | 350,000 | 1,728,000 | 2,650,000 | 380,000 |
| Total Assets | 277,000 | 541,500 | 2,087,500 [b] | 3,248,000 | 857,000 |
| LIABILITIES: |  |  |  |  |  |
| Owe Bank | 22,000 | 13,000 | 65,000 | 38,000 | —— |
| Owe Mortg. on Real Estate | 36,000 | 0 | 300,000 | 75,000 | 32,000 |
| Owe on Mach. and Equip. | — | 0 | 35,000 | 125,500 | —— |
| Owe John Deere Company | 8,000 [a] | 40,000 | 40,000 [a] | 86,000 [a] | 153,348.58 |
| Owe on Trucks and Autos | 7,000 [a] | 7,000 | 7,800 | 15,000 | —— |
| Total Liabilities | 73,000 | 60,000 | 447,800 [c] | 339,500 [d] | 185,348.58 [e] |
| TOTAL NET WORTH | 204,000 | 481,500 | 1,639,700 | 2,908,500 | 671,651.42 |

APPENDIX A—Continued
COMPARISON OF THE ROGER IVERSON FINANCIAL STATEMENTS

|  | Financial Statement Sept. 25, 1978 | Financial Statement Aug. 5, 1980 | Financial Statement Jan. 29, 1981 | Financial Statement July 23, 1981 | Financial Statement April 14, 1982 |
|---|---|---|---|---|---|
| Applicant Name | Roger Iverson | Roger Iverson | Iverson Brothers & Roger Iverson | Iverson Brothers | Roger Iverson |
| Equipment Purchase Amount | na | 50,551.25 [f] | 56,049.32 [f] | 91,209.17 [f] | 33,600.24 [f] |
| RATIOS: |  |  |  |  |  |
| Assets/Liabilities [1] | 3.79 | 9.03 | 4.66 | 9.57 | 4.62 |
| Equip. Purchase/Net Worth [1] | na | 0.10 | 0.03 | 0.03 | 0.05 |

[a] The number is unclear on the statement and has therefore been calculated from the total.

[b] The total assets figure on the original financial statement is missing a zero, so the total shown on this table is a correct total of the listed assets.

[c] Total liabilities total $447,800, but on the statement they are shown to be $177,800.

[d] Total liabilities total $339,500, but on the statement they are shown to be $339,000.

[e] Total liabilities total $185,348.58, but on the statement they are shown to be $185,348.68.

[f] Includes equipment sale price and finance charge.

[1] Ratios are those which John Deere testified are calculated on each customer's financial statement before an extension of credit is granted.