JACOBSEN, Appellant, vs. WHITELY and others, Respondents.

*February 19—March 9, 1909.*

*Deceit: Reliance on statements: Knowledge of falsity: Evidence: Nonsuit: Sale of corporate stock: Election between remedies: Rescission: Ratification: Witnesses: Redirect examination.*

1. An action for deceit cannot be maintained by one who acted blindly upon statements whose falsity he knew or by the exercise of ordinary observation would have known; but it is not essential that the person claiming to have been misled should have met every positive statement with incredulity and have made search to ascertain whether it was false.

2. In determining whether the falsity of statements was obvious the intelligence or acuteness of the plaintiff and the extent to which he relied upon defendant by reason of acquaintance or confidence are matters to be considered.

3. In an action for deceit in the sale of shares of stock in a dry goods company doing a retail business, the evidence—showing, among other things, that defendants were long-time acquaintances of plaintiff, that he had no adequate opportunity for the

examination necessary to an understanding of the books of the company, and that the action of defendants was such as to divert him from such examination—is *held* not to justify a nonsuit on the ground that, by the exercise of ordinary care and observation, plaintiff should have known the falsity of defendants' statements as to the assets, debts, business, and earnings of the company.

4. One who has been induced by fraud to purchase property may elect not to rescind the contract but to retain what he has received and recover damages for the deceit; and such right of recovery is defeated by no lapse of time less than that prescribed by the statute of limitations.

5. In an action for deceit in the sale of stock in a corporation, a financial statement with which defendants were not shown to have been connected was not admissible to corroborate the charge of specific fraud.

6. Upon redirect examination of a witness anything fairly explanatory of that which was drawn out on cross-examination is proper.

APPEAL from a judgment of the circuit court for Winnebago county: GEO. W. BURNELL, Circuit Judge. *Reversed*.

Action for damages from deceit. The plaintiff claimed that he was induced to buy capital stock at par to the amount of $3,000 in the Topliff Dry Goods Company, a corporation of this state, by fraudulent representations of the defendants to the effect that said company was doing a prosperous business, that its business was in a flourishing condition, that for the year 1904 it made a net profit in its business of over $4,000, and that the amount of its indebtedness was about $19,000 and its assets about $50,000: all with intent to induce plaintiff to buy said stock. Evidence was introduced of the making of said representations, of the material falsity thereof, of the extent of opportunity and ability of the plaintiff to ascertain such falsity before the purchase of said stock, and also a large amount of testimony of his opportunity to learn the same after he had purchased it and before commencing suit, during a part of which period he continued in the employ of said corporation at $25 per week, and was also a director and stockholder therein. The making of fraudulent

representations was also put in issue both by the pleadings and the evidence. At the close of the trial the court entered judgment of nonsuit, from which the plaintiff appeals.

For the appellant there was a brief by *Williams & Williams,* and oral argument by *G. E. Williams.*

For the respondents there was a brief by *Thompsons, Pinkerton & Jackson,* and oral argument by *J. C. Thompson.*

DODGE, J. As this case went off on nonsuit at the close of the plaintiff's evidence, it is only necessary to inquire whether there was any credible evidence which, taken with all intendments and reasonable inferences most favorably to the plaintiff, tended to establish the cause of action. It is undeniable that there was evidence that the defendants represented to the plaintiff that the corporation had assets of about $50,000; that its debts were only about $19,000; that it was doing a prosperous business and earned a substantial profit the preceding year; also that each of those statements was false, that plaintiff relied upon them, and that the stock purchased was of less value than if the facts stated had been true. Materiality of such representations to the making of the contract cannot well be doubted. We presume, however, the court's reason for entering the nonsuit was, as counsel for respondents argues, that plaintiff had full opportunity for knowing the falsity of the representations made to him before he purchased and therefore could not and did not rely upon their truth.

The rule of law is well established that a purchaser is not justified in relying upon the statements of the seller when their falsity is obvious to him, but this does not require that he shall meet every positive statement with incredulity and must search to ascertain whether it is false. The law recognizes the duty of each to refrain from even attempted deceit of another with whom he deals, and the right of the latter to assume that he will do so. It is an unsavory defense for a

man who by false statements induces another to act to assert that if the latter had disbelieved him he would not have been injured. *McClellan v. Scott,* 24 Wis. 81, 86; *Tyner v. Cotter,* 67 Wis. 482, 491, 30 N. W. 782. Nevertheless courts will refuse to act for the relief of one claiming to have been misled by another's statements who blindly acts in disregard of knowledge of their falsity or with such opportunity that by the exercise of ordinary observation, not necessarily by search, he would have known. He may not close his eyes to what is obviously discoverable by him. *Northern S. Co. v. Wangard,* 117 Wis. 624, 94 N. W. 785; *Kaiser v. Nummerdor,* 120 Wis. 234, 97 N. W. 932, and cases there cited; *Miller v. Hackbarth,* 126 Wis. 50, 52, 105 N. W. 311. It is in this sense only that opportunity to know the truth will prevent recovery for deceit. Whether the situation presents or fails to present such opportunity is usually a question of fact. The intelligence or acuteness of plaintiff is one important element. *Barndt v. Frederick,* 78 Wis. 1, 11, 47 N. W. 6; *Bowe v. Gage,* 127 Wis. 245, 246, 106 N. W. 1074. Another, is the reliance reposed by the buyer on the seller by reason of acquaintance or confidence. These and many other considerations have proper effect in deciding whether the truth was obvious, as appears in the various cases already cited and very many others. *Lockwood v. Allen,* 113 Wis. 474, 89 N. W. 492; *Bostwick v. Mut. L. Ins. Co.* 116 Wis. 392, 89 N. W. 538, 92 N. W. 246; *Mannel v. Shafer,* 135 Wis. 241, 115 N. W. 801; *King v. Graef,* 136 Wis. 548, 117 N. W. 1058.

In the light of these principles, let us examine the evidence, at least in its tendency. The opportunities claimed to have been enjoyed by the plaintiff from which, it is asserted, he must have known of the falsity of the statements made to him, are a visit to the store, with opportunity to observe the stock in trade and to examine the books. With reference to the first, we think it entirely open to inference whether mere observation of a dry goods store which, according to defendants'

evidence, contained from $38,000 to $40,000 worth of varied stock, would have made obvious to the plaintiff the impossibility of the total assets of the company equaling $50,000. We apprehend that no one, without a careful examination of how boxes and drawers were filled, and whether with the more or less valuable kinds of stock, could form even an estimate within twenty-five per cent. of the fact; besides which, of course, such observation would give no light whatever on the amount of the accounts receivable, which were outstanding and which of course constituted assets.

As to the books which were in evidence, they are a voluminous set of double-entry books, covering all the details of purchases from day to day and of petty sales in a retail business. They consist of a ledger of nearly 600 pages, containing approximately 450 different accounts, several of which extend over many pages, not consecutively, but scattered throughout the book, without complete reference to each page in any index. The books and designation of the general accounts of the business are highly artificial and capable of giving or withholding information according as the examiner was familiar with the system of bookkeeping and also with the key to the exact meaning of the several accounts. For example, the merchandise account was closed in January, 1905, with an entry indicating a gross profit on merchandise of some $9,000. Of course a skilled bookkeeper would have understood that this apparent profit was subject to various deductions, but primarily for expense. Had he turned to the expense account he would have found that to amount to but $2,600, but he would have not discovered that various classes of expenditures were not included under the caption "expense:" such as salaries and wages, insurance, advertising—each of considerable amount. Thus, unless familiar not only with the theory of double-entry bookkeeping but with the meaning in which the bookkeeper used the titles to the accounts, he might have been deluded into an understanding

that much profits had been made.  True, the profit and loss
account would not have shown any net profit, but in order that
he must be charged with notice of the profit and loss account
it must appear that he had knowledge of any such general bal-
ancing account, which by the way is usually a characteristic
of double-entry bookkeeping, in form at least.  Two of the
witnesses most familiar with these books testified that while
the facts might have been learned from them, they were ap-
parent only to a skilled bookkeeper,—to him only after suffi-
cient critical examination to master the individual peculiari-
ties.  There was evidence that the plaintiff possessed no such
skill; that he had no familiarity at all with double-entry book-
keeping or with its theory; that in his work as a dry goods
clerk he had learned how to refer to certain accounts upon
other sets of books, but nothing more.  It seems to us, there-
fore, that the jury might well have drawn the conclusion that
these books presented to him an incomprehensible maze of
figures without meaning or significance, such as to blind
rather than enlighten.

One item upon which defendants dwell is the "bills pay-
able" account, which, if understood, would have shown an ad-
verse balance of between $21,000 and $22,000, which they
claim, with the verbal information to plaintiff that there was
$9,000 of indebtedness in addition to bills payable, as the
fact apparently was, at once informed him that the indebted-
ness was as much as the fact, $32,000.  But here, again, a
key to the bookkeeper's terminology was essential to any such
deduction.  What did bills payable mean?  Did it include or
exclude bills owing to wholesale merchants for goods?  The
representation to plaintiff was that $10,000 was owing to the
bank and about $9,000 to such merchants.  The total of
$21,000 of the bills payable account would not be violently
variant from the total, and on the page on which he must have
looked it would have been apparent to a bookkeeper that at
least one $3,000 item included in that account represented in-

debtedness to J. V. Farwell & Co., well-known wholesale merchants; thus justifying an idea that the total covered not only indebtedness to the banks, but also indebtedness to merchants.

There is also evidence tending to prove that the only time when plaintiff sought to avail himself of the offered privilege of examining the books, he was accompanied to the store on a Sunday by one of the defendants, who spread certain books upon a desk and then told him that he knew nothing about the bookkeeping and could not explain its meaning, whereby plaintiff was unable to gain any information therefrom. The only other actual exhibition of books was made on an evening when plaintiff was called to the store by telephone just as he was retiring for the night. Books were spread upon the table, but all three defendants were present and entered into various discussions with plaintiff and with each other as to the details of an arrangement by which he should come into the corporation, the extent to which his name might be helpful, and to which he should, for the welfare of the concern, have managerial prominence. We think on both occasions there was evidence from which the jury might have well believed not only that no adequate opportunity for the examination necessary to the understanding of the books was enjoyed by plaintiff, but that the action of the defendants was such as to divert him therefrom.

To the foregoing facts may be added the consideration that the defendants were all long-time acquaintances of the plaintiff, some had been his fellow-workmen many years before, and a considerable intimacy of friendship had been maintained between them for a long time. Under such circumstances it has often been held that a positive assertion of a fact by the proposed seller may be thought by the trier of facts a sufficient diversion of the purchaser from availing himself of quite obvious opportunities for examination. We cannot avoid the conviction that the inference as to whether or not the falsity of the alleged misrepresentations was so apparent to the plaintiff that he must have known it by the exercise of that

care and observation which a person of ordinary care, of equal intelligence and understanding, would have exercised, was one for the jury, and that error was committed in granting the nonsuit.

Some contention is made by respondents that plaintiff, by retaining his stock and continuing in the employ of the company, as contemplated at the time of the purchase, after he must have ascertained the falsity of the representations, has so ratified the contract, or waived right to complain of the fraud, that he cannot recover. This seems to evince much confusion in the minds of the respondents' counsel as to the rights of one induced to make and execute a contract by deceit or false warranty. Under such circumstances the defrauded purchaser has at his election either of two rights: He may rescind the whole contract, and upon returning all that he has received may recover back all that he has paid, so that the parties may stand *in statu quo*. To this right it is doubtless essential that he act with reasonable promptness, and that enjoyment of rights under the contract will be deemed a waiver. He also has, however, the right to enjoy all the fruits of what he receives under the contract and to recover damages by reason of breach of warranty or deceit for whatever the property is in fact worth less than it would have been if as represented. *Bonnell v. Jacobs,* 36 Wis. 59; *Parry Mfg. Co. v. Tobin,* 106 Wis. 286, 82 N. W. 154; *Waupaca E. L. & R. Co. v. Milwaukee E. R. & L. Co.* 112 Wis. 469, 472, 88 N. W. 308; *Smeesters v. Schroeder,* 123 Wis. 116, 101 N. W. 363; *Palmer v. Goldberg,* 128 Wis. 103, 107 N. W. 478; *Fox v. Wilkinson,* 133 Wis. 337, 113 N. W. 669. This latter right, when he does not rescind, is absolute and destroyed by no lapse of time less than that prescribed by the statute of limitations. The plaintiff here has done nothing more than to retain all that he got under the contract, and is entitled to recover that which he would have received if facts falsely represented by defendants had existed.

As to the rulings on evidence, we need not decide whether

there was reversible error. We think the redirect examination of plaintiff as to what transpired before the commissioner when his deposition was taken under sec. 4096, Stats. (1898), was somewhat restricted, and yet the court evidently recognized the true rule of law that anything fairly explanatory of that which had been drawn out on cross-examination was proper. He was equally correct in the view that a certain so-called financial statement with which the defendants were not shown to have been connected was not proper to go to the jury to corroborate the charge of specific fraud.

The remaining question as to competency of plaintiff's wife as a witness is not likely to arise in the same form upon a new trial, and we therefore forego discussion thereof.

*By the Court.*—Judgment reversed, and cause remanded for a new trial.