In re Dewayne R. HOWARD, Debtor.

**HOUSEHOLD FINANCE CORPORATION,**
**Plaintiff,**

v.

**Dewayne R. HOWARD, Defendant.**

**Bankruptcy No. 85-40614.**
**Adv. No. 86-4003.**

United States Bankruptcy Court,
N.D. Indiana,
Hammond Division at Gary/Lafayette.

Jan. 30, 1987.

page 10 of the text of this memorandum, *supra.*

Eric Burns, Lafayette, Ind., for Household Finance Corp.

Randall Vonderheide, Lafayette, Ind., for debtor.

### Findings of Fact, Conclusions of Law And Judgment

KENT LINDQUIST, Chief Judge.

#### I

#### Statement of Proceedings

This adversary proceeding came on for bench trial on October 9, 1986, on the complaint filed by Household Finance Corporation (hereinafter: "HFC") filed January 14, 1986, asserting the alleged indebtedness to it by the Debtor Dewayne R. Howard (hereinafter: "Debtor") should be determined by this Court to be non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(B) in that the Debtor knowingly published a false and misleading financial statement with the intent to deceive HFC.

Submitted. Evidence and Arguments heard.

#### II

#### Findings of Fact

HFC's sole witness was John Hirsch, senior assistant manager of HFC, who was a branch representative employed by HFC for a period of two one-half months all the time of the loan in question by HFC to the Debtor.

The Debtor first contacted HFC on March 21, 1985 and inquired about a loan. Pursuant to Hirsch he followed the normal HFC procedures in processing the Debtor's loan application by obtaining his name, address, job, a list of all creditors and assets. Per Hirsch, the Debtor orally advised him he only owed Lafayette National Bank ("LNB"), Sears, and his house mortgage. The Debtor was instructed by Hirsch to return to the HFC office after he had done the initial processing.

Hirsch then asserted he called LNB and verified that debt, but did not call Sears as their policy is to not answer credit inquiries by phone.

HFC is "on-line" with a credit reporting agency in Indianapolis, namely, Associated Credit Services, and as part of the standard credit-checking procedure HFC ordered a computer print out of the Debtor's credit record as shown in Associates file. That computer print out reflected that the Debtor had been in the file since 1965 and had an "outstanding" credit record. The outstanding creditors reflected on the report were LNB and Sears and two small claim judgments.

Per Hirsch, Associated report revealed five inquiries that had been made by other creditors, Number 1) Industrial Credit Union; 2) LNB; 3) Avco Finance; 4) Heights Finance; and, 5) "MIN". (Hirsch could not ascertain what creditor, if any, this was).

Hirsch stated he called four of the creditors who had made an inquiry as set out above, with the exception of "MIN" and received the following responses:

1. Industrial Credit Union: No record found
2. LNB: open credit

3. Avco: had pending application (March of 1985) to borrow from Debtor with the purpose being to pay off loan of Debtor's son (main reason given by Debtor to HFC).

4. Heights Finance: loan application denied—reason not given (March of 1985).

The Associated report also reflected a $56.00 collection account.

Hirsch related that he discussed the Associated report with the manager and after reviewing the Debtor's gross salary to total monthly credit payment ratio which was 27% (HFC's acceptable ratio is 40% or less), they came to the initial conclusion there was no reason to deny the loan.

The next step in the loan process was to have the Debtor come in and fill out a written financial statement. This was done on March 22, 1985 (the statement was dated April 22, 1985, Hirsch noted he made an error as to the date and was thinking of the potential first payment date).

Although, Hirsch cannot recall what actually transpired on March 22, 1985, the required HFC procedure at this state of the loan process was to hand the applicant a standard loan application that was not filled in in any way and ask the Debtor to fill in the loan amount and terms of the loan proposed to be made by HFC in his own handwriting.

The applicant is then asked if he owes the monies to those creditors as set out in the credit report. If he replies "yes" the Debtor is instructed to fill in the names and amounts on the financial statement.

The applicant is then asked without qualification as to type or amount if he has any other debts and if the applicant states "No", the applicant is instructed to write in "I have no other debts", fill in the amount of any real estate mortgage and sign the statement.

If there are no discrepancies between the Associated report and the applicant's responses, the loan is closed. If there are, the manager must first review.

Here, Hirsch found only two discrepancies, i.e. two small claim judgments without the amounts given. Per Hirsch, these were referred to his manager who approved the discrepancies.

The loan was thus closed and $3,035.48 as the loan proceeds were in fact disbursed to the Debtor by HFC check on March 22, 1985 and that only one $90.00 payment was made thereon. Evidence as to the date of payment, the accrued interest on the date of the Debtor's petition and the balance due and owing on the date of the Debtor's petition was not submitted by the Plaintiff. The loan was unsecured with no guarantors.

HFC had introduced into evidence the financial statement as Plaintiff's Exhibit No. 1. A true copy thereof is as follows:

PLEASE READ THESE INSTRUCTIONS

This statement must be in applicant's own handwriting. Before completing and signing this statement *please* review all your debts carefully. Be sure you have disclosed *all your debts* of all kinds and that the facts stated in this statement are correct. *Do not*, under any circumstances, *omit any debts.* We rely upon your good faith and the truth of your representations.

# FINANCIAL STATEMENT

· The undersigned having applied to Household Finance Corporation or one of its subsidiary corporations for a loan of $3,035 *48*, for *60* months, for the purpose of showing his, her, or their ability to repay the same, and inducing such corporation to make said loan, hereby represent and warrant that the following is a full, complete, and correct list of all debts and liabilities of and other claims against them and each of them on *4-22-85* ...............*(If no debts, so state)*

(Month—Day—Year)

| | AMOUNT OWED | |
|---|---|---|
| | DOLLARS | CENTS |
| Present loan balance with Household Finance Corporation and subsidiaries | $ | |
| APPLICANT(S) MUST LIST ALL DEBTS – DO NOT OMIT ANY DEBTS<br>(Disputed and so-called outlawed claims must be included.)<br>Name of creditor — Nature of debt | | |
| *LAF NAT BANK* | $ *7000* | — |
| *SEARS* | $ *150* | |
| | $ | |
| *Show Me ole Note* | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| All debts and claims except Real Estate Contracts and Mortgages TOTAL | $ *7150* | — |
| Real Estate Contracts and Mortgages: (Give name of mortgage or contract holder and unpaid balance) | *40,000* | — |
| | $ *1* | |
| | $ | |

WITNESS our hands and seals the day and year above set forth.

Executed and delivered in the presence of:

..............*(signature)*..............(SEAL)

..............................................................(SEAL)

.........*(signature)*.........
Witness

FORM 8 —REV. 3-68

---

The Plaintiff then asked the Court to judicially notice the Debtor's schedules of creditors A–2 and A–3 filed with the Clerk of the Court in the Debtor's main case on October 30, 1985, as amended on January 3, 1986. These schedules reflected the following debts, dates incurred, and nature of indebtedness, which HFC asserts that the Debtor owed at the time of the loan by HFC on March 22, 1986:

$10,000.00 owed to Wilbur Cadwallader—incurred 1982, disputed

$7,000.00 owed to Industrial Credit Union—incurred March, 1984 on 1940 Taylor Craft Airplane

$12,500.00 owed to Roland P. Martin—real estate mortgage on residence, incurred January, 1981

$3,100.00 owed to Beneficial Finance—various renewals (date incurred not given)

$22,480.76 owed for Medical Indebtedness—(This is comprised primarily of $23,602.76 of debt to St. Elizabeth Hospital medical center which the Debtor shows in his schedule as "continuing open account (in name of Betty L. Howard)".

$3,000.00 owed to Larry Williams—note of 1982

$5,300.00 owed to Dennis Pitzer—incurred 1982—disputed

$3,900.00 owed to Hippensteel Funeral Home—incurred August, 1984

The above debts total $67,000.00 and Hirsch stated unequivocally that had he known of these $67,000.00 in debts he would have definitely not recommended the loan, and relied on the credit report and the Debtor's financial statement in making the loan. Hirsch noted that it must rely ultimately on the applicant's financial statement rather than merely the Associated Credit Report and inquiries in that some institutional lenders do not report their credit transactions and private creditors seldom do so.

The Debtor testified he was a 56 year old widower, had two years of college, and no financial background. He asserted he had been a crane operator for the last 21 years and had previously filed bankruptcy in 1968. He had no prior dealings with HFC.

The Debtor further testified that the indebtedness he scheduled for Cadwallader in the sum of $10,000, and Pitzer in the sum of $5,300.00 were not considered debts by him when he obtained the loan in question as he had no knowledge that these individuals would assert claims against him at the time of the loan. The Debtor stated he initially had no creditor-debtor relationship with Cadwallader or Pritzer but that they were co-investors with the Debtor in a silver mine investment that went bad and these individuals asserted claim versus the Debtor on alleged bad investment advice

subsequent to the date of the financial statement.

As to the alleged debt to St. Elizabeth Hospital in the sum of $20,607.76, the Debtor asserts this was his deceased wife's bill arising out of her illness and he was never rendered a bill for the same. He never deemed this his debt and further asserted that his deceased wife's employer had insurance to cover the same and that said bill was eventually paid by the insurance carrier. (It is noted that in the Debtor's schedules, this "Debt" is shown as in the name of Betty L. Howard). The Debtor stated he scheduled the hospital in the event that they might deem him liable upon the advice of his counsel.

As to the indebtedness to one Roland P. Martin for $12,500, the Debtor admits he "forgot" about that debt as it was a balloon note signed in January, 1981 for the down payment on a home he purchased from Martin, since no periodic payments were to be made thereon until the final balloon payment which was not due January, 1986.

The Debtor also stated he "forgot" about the 1982 note to one Larry Williams, a commodities broker, for $3,000.00 as it had been some time previous when the note had been signed and Williams had not pressed for collection.

As to the indebtedness to Hippensteel Funeral Home for $3,900.00, which the Debtor scheduled as being incurred in August, 1984, he asserted that he did sign to be personally responsible for that bill for his wife's funeral but that he did not feel he would have to pay the same as he was under the impression that his wife's employer carrier insurance to pay for the same but that he learned some 18 months later she had no such insurance.

As to the Industrial Credit Union debt in the alleged sum of $7,000.00 which HFC asserts the Debtor fraudulently omitted from his financial statement, the Court finds there was no evidence presented that this was the balance due on the date of the loan or that the loan was even in existence on that date. The scheduled amount of

Industrial's secured claim was $5,600.00 per schedule A–2 filed October 30, 1985, not $7,000.00. The date this claim was incurred is listed as March, 1984 with no exact date given. It is noted that on March 21, 1985 based on the Associated Credit report showing an inquiry by the credit union Hirsch made a call to the credit union and they found no record of the loan at that time. The Debtor testified the credit union loan was taken out after the HFC loan.

As to the Beneficial loan, for $3,100.00 which HFC asserts the Debtor fraudulently omitted from his financial statement, the Debtor's schedules do not reflect the date that debt was incurred. HFC provided no independent evidence that it was incurred prior to the HFC loan and the Debtor could not recall if it was incurred prior to or after the HFC loan. The Associated Credit Report to HFC did not reveal the existence of any such debt at the time the Debtor applied for his loan with HFC.

### III

*Conclusions of Law and Discussion*

At the outset the Court would note some basic legal principles that apply to adversary proceedings instituted by a creditor to have a debt determined to be nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

In keeping with the purpose of the Bankruptcy Code, exceptions to the general rule of dischargeability of debts are to be strictly construed in favor of the Debtor. *In re Linn,* 38 B.R. 762 (9th Cir.B.A.P.1984); *In re Marino,* 29 B.R. 797 (N.D.Ind.1983). The exceptions to dischargeability must be narrowly construed against the creditor's objections, and confined to those plainly expressed in the Code. *In re Norman,* 25 B.R. 545 (Bankr.S.D.Cal.1982). This is done to effectuate the fresh start policies of the Bankruptcy Code. *In re Levitan,* 46 B.R. 380 (Bankr.E.D.N.Y.1985); *In re Nicolle,* 42 B.R. 87 (Bankr.N.D.Ill.1984).

■■■ Although, the nondischargeability provision of the Bankruptcy Code has no provisions allocating the burden of proof brought under it, the creditor must establish that the debt is nondischargeable and has the burden on each element. *In re Kreps,* 700 F.2d 372, 376 (7th Cir.1983); *In re Bowers,* 43 B.R. 333 (Bankr.E.D.Pa. 1984); *Matter of Reinstein,* 32 B.R. 885 (Bankr.E.D.N.Y.1983); *In re Paley,* 8 B.R. 466 (Bankr.E.D.N.Y.1981). The creditor objecting to discharge of a debt in bankruptcy bears a heavy burden of proof to establish that the debt is squarely within the statutory exceptions. *In re Marino,* 29 B.R. 797 at 799, *supra.* The party objecting on the ground of fraud must establish each element of the claim by clear and convincing evidence. *In re Kimzey,* 761 F.2d 421, 423 (7th Cir.1985); *Matter of Bogstad,* 779 F.2d 370, 372 (7th Cir.1985). This is, of course, a higher standard of proof than a fair preponderance of the evidence. However, once a creditor establishes a *prima facie* case of fraud, the burden of coming forward with some proof or explanation of the alleged fraud shifts to the Debtor. *Carini v. Matera,* 592 F.2d 378 (7th Cir.1979). The Debtor's unsupported assertions of honest intent will not overcome the natural inferances from admitted facts. 3 *Collier on Bankruptcy,* ¶ 523.09, (p. 523–62) (L. King, 15th Ed.).

11 U.S.C. § 523(a)(2)(B) upon which HFC relies in asserting that the scheduled indebtedness to it is nondischargeable provides as follows:

§ 523. Exceptions to discharge.

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

\* \* \* \* \* \*

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

\* \* \* \* \* \*

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive; or. . . .

The legislative history reference to § 523(a)(2)(B) is helpful in putting this non-dischargeability provision into perspective.

The House and Senate Reports are substantially the same. The Senate Report states:

> Paragraph (2) provides that as under Bankruptcy Act § 17a(2), a debt for obtaining money, property, services, or a refinancing extension or renewal of credit by false pretenses, a false representation, or actual fraud, or by use of a statement in writing respecting the debtor's financial condition that is materially false, on which the creditor reasonably relied, and which the debtor made or published with intent to deceive, is excepted from discharge. This provision is modified only slightly from current section 17a(2). First, "actual fraud" is added as a ground for exception from discharge. Second, the creditor must not only have relied on a false statement in writing, but the reliance must have been reasonable. This codifies case law construing present section 17a(2). Third, the phrase "in any manner whatsoever" that appears in current law after "made or published" is deleted as unnecessary, the word "published" is used in the same sense that it is used in defamation cases.

Senate Report No. 95–989, 95th Cong.2d Sess. 78 (1978), U.S.Code Cong. & Admin. News 1978, pp. 5787, 5864, Reprinted in 4 *Norton Bankruptcy Law and Practice, Annotated Legislative History,* § 523, pp. 396–397 (Callaghan & Co.).

The Congressional Record statements regarding § 523(a)(2) by Rep. Edwards and Sen. DeConcini are as follows:

> Section 523(a)(2) likewise represents a compromise between the position taken in the House bill and the Senate amendment with respect to the false financial statement exception to discharge. In order to clarify that a "renewal of credit" includes a "refinancing of credit", explicit reference to a refinancing of credit is made in the preamble to section 523(a)(2). A renewal of credit or refinancing of credit that was obtained by a false financial statement within the terms of section 523(a)(2) is nondischargeable. However, each of the provisions of section 523(a)(2) must be proved. Thus, under section 523(a)(2)(A) a creditor must prove that the debt was obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. Subparagraph (A) is intended to codify current case law e.g., Neal v. Clark, 95 US 704 (1887), which interprets "fraud" to mean actual or positive fraud rather than fraud implied in law. Subparagraph (A) is mutually exclusive from subparagraph (B). Subparagraph (B) pertains to the so-called false financial statement. In order for the debt to be nondischargeable, the creditor must prove that the debt was obtained by the use of a statement in writing (i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for obtaining money, property, services, or credit reasonably relied; (iv) that the debtor caused to be made or published with intent to deceive. Section 523(a)(2)(B)(iv) is not intended to change from present law since any statement that the debtor causes to be made or published with the intent to deceive automatically includes a statement that the debtor actually makes or publish with an intent to deceive. Section 523(a)(2)(B) is explained in the House report. Under section 523(a)(2)(B)(i) a discharge is barred only as to that portion of a loan with respect to which a false financial statement is materially false.

> In many cases, a creditor is required by state law to refinance existing credit on which there has been no default. If the creditor does not forfeit remedies or otherwise rely to his detriment on a false financial statement with re-

spect to existing credit, then an extension, renewal, or refinancing of such credit is nondischargeable only to the extent of the new money advanced; on the other hand, if an existing loan is in default or the creditor otherwise reasonably relies to his detriment on a false financial statement with regard to an existing loan, then the entire debt is nondischargeable under section 523(a)(2)(B). This codifies the reasoning expressed by the second circuit in *In re Danns*, 558 F2d 114 (2d cir 1977). 124 Cong.Rec. H11095.96 (daily ed. Sept. 28, 1978); S17412 (daily ed. Oct. 6, 1978). Reprinted in 4 *Norton Bankruptcy Law and Practice, Annotated Legislative History*, § 523, pp. 397–398 (Callaghan & Co.).

The Court will review each of the legal elements that HFC must prove to support a finding of nondischargeability.

### In Writing

■ In order that a false statement regarding a debtor's financial condition render a debt nondischarge pursuant § 523(a)(2)(B) the statement must be in writing, must have been written by the Debtor, signed by the Debtor, or the particular writing must have been adopted or used by the Debtor. *See, Blackwell v. Dabney*, 702 F.2d 490 (4th Cir.1983); *Engler v. Van Steinburg*, 744 F.2d 1060 (4th Cir.1984); *Lowell Holding Corp v. Granovetter*, 29 B.R. 631, 639 (Bankr.E.D.N.Y. 1983); *In re Aldrich*, 16 B.R. 825, 829 (Bankr.W.D.Ky.1982); *Bottari v. Baiata*, 12 B.R. 813, 817 (Bankr.E.D.N.Y.1981). There is no requirement that the Debtor sign the financial statement only that the Debtor "cause (the financial statement) to be made or published with the intent to deceive"; *In re Shelton*, 42 B.R. 547, 548 (Bankr.E.D.Mo.1984).

The distinction between § 523(a)(2)(A) and § 523(a)(2)(B) is that (a)(2)(A) includes any fraudulent acts or statements including those made orally *but expressly excludes oral statements respecting the debtor's financial condition.* For a debt to be nondischargeable under § 523(a)(2)(B), a statement respecting the debtor's financial condition must be in writing and otherwise meet the requirements of (a)(2)(B). *In re Roberts*, 54 B.R. 765, 770 (Bankr.D.N.Dak.1985). For instance, the *Engler* court *supra*, held that a debtor's assertions that he owns assets free and clear of liens is a statement respecting his financial condition, but did not bar his discharge pursuant to § 523(a)(2)(B) as the statement was oral. *Engler v. Steinburg*, 744 F.2d 1060, 1061, *supra*. *See also, In re Cook*, 46 B.R. 545.550 (Bankr.E.D.Va. 1985) (equipment list submitted by borrower to secure loan was held to be statement in writing respecting his financial condition pursuant to § 523(a)(2)(B)).

■ To render a debt nondischargeable it is not necessary that the false written statement concerning the financial condition of the debtor be included in a formal financial statement; any written document will serve as § 523(a)(2)(B) refers to a much broader class of statement—those "respecting the debtor's financial condition." *Engler v. Van Steinburg*, 744 F.2d 1061 at 1062, *supra*. The writing required by § 523(a)(2)(B) is sufficiently broad enough to include any statement made by the Debtor, not just formal financial statements and documents in a bank or commercial setting. *In re Roberts*, 54 B.R. 765, 770, *supra*.

For the purposes of § 523(a)(2)(B) the concept of publication is the same as in the tort area and generally means to make known to another. *In re Simpson*, 29 B.R. 202, 210 (Bankr.N.D.Iowa 1983).

### Materially False

■ The statement to be material must be more than inaccurate. It must be "materially" false, *Matter of Bogstad*, 779 F.2d 370, 372, *supra*. It must be substantially inaccurate and must be information that effected the creditor's decision making process. *Bates v. Winfree*, 34 B.R. 879, 884 (Bankr.M.D.Tenn.1983). For an erroneous financial statement to be considered "false" not only must it in fact be one that is incorrect, but it must have been executed with actual intent to defraud. Such specific intent to deceive one's creditors can be demonstrated in one of two ways; either the false statements are intentional or

knowingly made, or, the statements are made with such reckless indifference to the facts that there are no reasonable grounds to believe they are in fact correct. *Butler v. Lind,* 6 B.R. 374, 378 (Bankr.S.D.Tex. 1980).

A "materially false financial statement" has often been defined as one which paints a substantially untruthful picture of the debtor's financial condition by representing information of a type that would normally effect the decision to grant credit. The information must not only be substantially inaccurate, but it must also be information which effected the creditor's decision making process. *See, In re Iverson,* 66 B.R. 219, 224 (Bankr.D.Utah 1986). And as noted by the Seventh Circuit Court of Appeals in *Matter of Bogstad,* a material falsity has been defined as "an important or substantial untruth" and that "a recurring guide post used by the courts has been to examine whether the lender would have made the loan had he known of the debtor's true condition." *Matter of Bogstad,* 779 F.2d 370, 375, *supra.*

■ The omission, concealment, or understatement of any of the Debtor's material liabilities constitutes a "materially false" statement. *In re Harmer,* 61 B.R. 1, 5 (Bankr.D.Utah 1984).

The word "false" means more than erroneous or untrue and thus the materially false statement in writing must have been intentionally made to bar a discharge. *Genesis Leasing Corp. v. Mangham,* 8 B.R. 222, 223 (Bankr.S.D.Ohio 1981). Although a showing of unknowing inaccuracy is not enough to establish an intent to deceive, actual knowledge of the falsity of financial information is not required. A creditor can establish intent to deceive by proving reckless indifference to, or reckless disregard of the accuracy of the information in the financial statement of the debtor. *In re Coughlin,* 27 B.R. 632, 636 (1st Cir.B.A.P.1983); *Citizens National Bank v. Vandergrift,* 35 B.R. 76, 78 (Bankr.D. Md.1983). It has thus been held by the Seventh Circuit Court of Appeals that where a person knowingly or recklessly makes a false representation which the person knows or should have known, will induce another to make a loan, intent to deceive may be logically inferred. *Matter of Garman,* 625 F.2d 755, 764 (7th Cir. 1980) *citing, In re Carini v. Matera,* 592 F.2d 378, 380 (7th Cir.1979). *The Carini* court cited the case of *In re Houtman,* 568 F.2d 651 (9th Cir.1978) with approval which also held that reckless disregard for the truth can satisfy the scienter requirement. The *Houtman* court stated:

The Supreme Court decision in *Morimura, Arai & Company v. Taback,* 279 U.S. 24, 49 S.Ct. 212, 73 L.Ed. 586 (1929) provides further support for our holding. In that case the Court held that "reckless indifference to the actual facts, without examining the available source of knowledge which lay at hand, and with no reasonable ground to believe that it was in fact correct" was sufficient to establish the knowledge element under a provision of the Bankruptcy Act then current which completely barred a discharge of all debts if the bankrupt had made a materially false statement in order to obtain property on credit. *Id.* at 33, 49 S.Ct. at 215. Since the 1960 amendment to the Bankruptcy Act, use of a materially false statement in order to obtain credit is no longer a complete bar to discharge for individual bankrupts, but is included in § 17(a)(2) along with false representations as one of the grounds which will render an individual debt nondischargeable. The close statutory relationship of these two concepts now suggests that a similar definition of knowledge would be appropriate. Further, a strict reading of the knowledge element of the false representation exception would have the incongruous effect of imposing a stricter standard for exempting a single debt from discharge than formerly was required to completely bar discharge of all debts.

In addition, the scienter requirement in the tort of misrepresentation generally has been interpreted to include recklessness. *See* W. Prosser, Torts, § 701 (4th Ed.1971). The reasons for inclusion, *viz.* the difficulty in distinguishing knowledge from reckless disregard, and to dis-

courage the shunning of truth to preserve the defense of no scienter, are applicable with equal force in the bankruptcy context.

Finally, there are dicta in other decisions of this circuit which suggest that our interpretation is proper. *Matter of Nelson*, 561 F.2d 1342 (1977) ("knew or should have known"); *Wright v. Lubinko*, 515 F.2d 260 (9th Cir.1975) ("fraudulent intent or reckless disregard for the truth tantamount to willful misrepresentation").

### Respecting Debtor's or Insider's Financial Condition

Section 523(a)(2)(B) only relates to statements respecting the financial condition of the debtor. For instance, a dispute over debtor's written statements about encumberances or assets is a matter regarding the financial condition of the debtor. *Citizens & Northern Bank v. Phillips*, 27 B.R. 646, 647 (Bankr.M.D.Pa.1982). On the other hand, checks which are dishonored because of insufficient funds are not normally included within the definition of false financial statements. *Heinhold Commodities & Sec. Inc. v. Hunt*, 30 B.R. 425, 437 (Bankr.M.D.Tenn.1983); *Hill v. Murray*, 7 B.R. 899 (Bankr.W.D.Mo.1981).

### Reasonable Reliance

Section 523(a)(2)(B)(iii) is very explicit in that it requires that the creditor from whom money, property, services, or an extension of credit was obtained "reasonably relied" on the statement.

The preceding version of § 523(a)(2)(B) (§ 17(a)(2) of the Bankruptcy Act) provided that an individual debt could not be discharged in bankruptcy if that debt or its renewal is the result of money obtained "in reliance (by the creditor) upon a materially false statement in writing respecting (the Debtor's) financial condition made or published ... with intent to deceive...." Although section 17(a)(2) had no element requiring that the reliance be reasonable, the Seventh Circuit as well as other Courts read one into the terms of the statute. *Matter of Garman*, 643 F.2d 1252 (7th Cir.1980). The Seventh Circuit stated:

Initially, we note that § 17(a)(2), unlike its successor does not by its terms require a showing of "reasonable reliance" and requires only a showing of reliance in fact.... Although some of the mentioned cases do, in fact, refer to "reasonable" or justifiable reliance as a requirement under § 17(a)(2), they do not require the court, as was done in the present case, to undertake a subjective evaluation and judgment of a creditor's lending policy and practices. These cases simply stand for the proposition that reasonableness is circumstantial evidence of actual reliance; that is, dischargeability shall not be denied where a creditor's claimed "reliance" on a "financial statement" would be so unreasonable as not to be actual reliance at all.

*Id.* at 1255–56. (Footnotes omitted).

The Court in *Garman* rejected the lower court's concern with the fact that the creditor took no steps to confirm or verify the information set forth in the debtor's financial statement. The Court noted that the creditors failure to verify the information was not so unreasonable as to justify a finding of no reliance as the debtor was a longtime customer of the creditor. The Court found that the statements themselves contained no information indicating that further investigation may be required nor was there any allegation that further investigation would have uncovered the great majority of the unlisted claims that were attributable to informal or oral arrangements between the debtor and his friends. The Court noted that the lower court was concerned about the fact that the creditor based its decision to lend money on net worth and the nature of the Debtor's assets rather than the Debtor's income and stated, "[I]t is not the Court's duty under § 17(a)(2) to second guess a creditor's decision to make a loan or set a loan policy for the creditor." *Id.* at 1258. The Court added:

[A]lthough a creditor is not entitled to rely upon an obviously false representation of the debtor, this does not require him or her to view each representation

with incredulity requiring verification. "The law recognizes the duty of each to refrain from even attempted deceit of another with whom he deals, and the right of the latter to assume that he will do so...." *Jacobsen v. Whitely,* 138 Wis. 434, 120 N.W. 285, 286 (1909). Absent any facts reasonably indicating verification was necessary, we are not persuaded that the Northern's failure to verify rendered its reliance so unreasonable as to discharge Garman's debt.

*Id.* at 1259–60.

Section § 523(a)(2)(B)(iii) codifies the previous case law construing the predecessor to § 523(a)(2)(B) which was § 17(a)(2) of the Bankruptcy Act and is in keeping with the congressional history as set out *supra. See, In re Kreps,* 700 F.2d 372, 375 (7th Cir.1983) where the Court held the party alleging reliance must make an affirmative showing of such reliance. The *Kreps* Court added:

> Section 523(a)(2) differs in language from its predecessor, section 17(a)(2) of the Bankruptcy Code, 11 U.S.C. § 35(a)(2) (1976). Section 17(a)(2) provided in relevant part that a discharge in bankruptcy shall not release liabilities for ... obtaining [a] ... renewal of credit *in reliance* upon a materially false statement in writing respecting his financial condition made ... with intent to deceive.... (emphasis added.)
>
> Cases interpreting section 17(a)(2) developed two judicial glosses. First, because direct proof of actual reliance is difficult, actual reliance may be proven by circumstantial evidence of reliance. *See Matter of Garman, supra,* 625 F.2d at 759. Second, actual reliance must be reasonable, *Carini v. Matera,* 592 F.2d 378, 381 (7th Cir. 1981) (per curiam). In *Matter of Garman,* we discussed the meaning of "reasonable." We held that this second aspect of the section 17(a)(2) reliance test is not meant as an invitation to "second guess a creditor's decision to make a loan or to set loan policy for the creditor." 625 F.2d at 761. Fur-

ther, section 17(a)(2) was not intended to empower the court to "undertake a subjective evaluation and judgment of a creditor's lending policies and practices." *Id.* at 759. *Garman* reversed the Bankruptcy Court's finding that the creditor's reliance upon net worth, rather than income, was unreasonable.

> Congress clearly indicated that section 523(a)(2)(B)(iii) is merely a codification of the cases construing section 17(a)(2). "[T]he creditor must not only have relied on a false statement in writing, the reliance must have been reasonable. This codifies case law construing [section 17(a)(2)]." H.R.Rep. No. 595, 95th Cong., 1st Sess. 364 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 77–79 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5864, 6320.

*In re Kreps,* 700 F.2d 372 at 375–76, *supra.*

Lack of reasonable reliance has been found by the courts in a variety of fact situations. Set out below are the most common scenarios where the court's have questioned the reasonableness of the creditor's reliance on the financial statement:

1. The creditor knows from past experience or a previous financial statement that the information disclosed is not accurate, is incomplete, or inconsistent or the statement is erroneous on its face. *In re Mitschuler,* 45 B.R. 482, 493 (Bankr.D.N.Dak.1984); *In re Jackson,* 32 B.R. 549 (Bankr.E.D.Pa.1983); *In re Houk,* 17 B.R. 192 (Bankr.D.S.Dak.1982) (Debtor had actual knowledge of adverse credit information such as judgment and lien not noted in Debtor's financial statement); *In re Klein,* 20 B.R. 119 (Bankr. E.D.Pa.1982); *In re Futterman,* 35 B.R. 102 (Bankr.D.Conn.1983).

2. The loan application itself fails to solicit adequate or sufficient information. *In re Andrews,* 33 B.R. 970, 973 (Bankr. D.Mass.1983); *In re Magnusson,* 14 B.R. 662, 668 (Bankr.N.D.N.Y.1981); *In re Issacs,* 15 B.R. 210 (Bankr.S.D.Ohio, 1981).

3. The creditors' investigation of the statement or the Debtor's background

suggests the statement is false or incomplete. *In re Duncan*, 35 B.R. 323, 325 and N. 7 (Bankr.W.D.Ky.1983); *Kentile Floors v. Winham*, 440 F.2d 1128 (9th Cir.1971); *In re Smith*, 2 B.R. 276 (Bankr.E.D.Va.1980).

4. The creditor fails to make independent inquiries to verify, or require the Debtor to verify the accuracy of the information on the statement. *In re Bridges*, 51 B.R. 85, 89 (Bankr.W.D.Ky. 1985); *In re Volpe*, 32 B.R. 314, 315–316 (Bankr.W.D.N.Y.1983); *In re Harms*, 53 B.R. 134, 140–141 (Bankr.D.Minn.1985) (*See*, p. 141, N. 3 however. The *Harms* Court did not hold that there is imposed on the creditor a duty to make an independent verification of the financial statement regardless of whether the creditor had cause to subject the information to be false or not and questioned if the Code imposes such a burden where individual or industry practice do not already require it); *In re Cann*, 43 B.R. 733, 735 (Bankr.W.D.Mo.1984). (Failure to check public records where Debtor makes representation as to state of public record). *In re Breen*, 13 B.R. 965 (Bankr.S.D.Ohio W.D.1981). *Cf. In re Garman*, 643 F.2d 1252 *supra; Matter of Bogstad*, 779 F.2d 370 *supra*.

5. The creditor does not take the usual and customary steps and procedures customary in its own lending practice or in the lending industry in verifying the information provided by the debtor. *Matter of Patch*, 24 B.R. 563, 567–568 (Bankr.D.Md.1982).[1] *Cf., In re Garman*, 643 F.2d 1252, *supra*.

6. The financial statement is not actually considered or relied upon by the creditor in making the loan decision. *In re Jones*, 3 B.R. 410, 413 (Bankr.W.D.Va. 1980); *In re Adair*, 17 B.R. 456, 462 (Bankr.N.D.Ga.1980).

7. The lender makes the loan notwithstanding the fact that the debtor's statement has clear indicia that the debtor is not credit worthy. *Matter of Granovetter*, 29 B.R. 631, 640 (Bankr.E.D.N.Y. 1983), i.e. the creditor ignored numerous inconsistencies and suspicious circumstances or "red flags" in the application itself.

8. The creditor's loan officer tells or infers to the debtor that not all debts need be listed (e.g. only the largest or most representative). *In re Whiting*, 10 B.R. 687, 690 (Bankr.E.D.Pa.1981).

It has also been held that it is not reasonable to rely merely on mathematical ratios calculated from information contained in up-dated statements, without also comparing the current information to previously submitted financial statements in the creditor's possession. *In Matter of Bonanza Import and Export, Inc.*, 43 B.R. 577, 578–79 (Bankr.W.D.Wis.1984).

The Court in *Matter of Bogstad*, 779 F.2d 370, 373 n. 4, *supra*, in discussing reasonableness of reliance by a lender stated:

The question of the reasonableness of a creditor's reliance may be highly dependent on the particular facts of the lending transaction. Courts should not, however, be eager to intrude into the business practices of lending institutions. Nonetheless, the conclusion of the district court in this case makes us uneasy.

There seems to be a significant difference between the on-going business relationships which, we held in *In re Garman*, 643 F.2d 1252, 1257–59 (7th Cir. 1980), *cert. denied sub nom. Garman v. Northern Trust Co.*, 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981), and *In re Kreps*, 700 F.2d 372, 376 (7th Cir. 1981), can excuse a bank from verifying a financial statement and the absence of a "scarlet letter" on the breast of a loan applicant who is, basically, a stranger to the lender. . . .

---

**1.** This Court however agrees with the Court in *In re Allen*, 65 B.R. 752, 763 and NN. 15 and 16 (E.D.Va.1986), that although inquiry is appropriate into the business practices of the creditor or the industry customs as to a certain degree of verification, reliance is not measured by a *per se* verification standard, but rather against standards as they are factually developed in a given set of circumstances. *Contra, Matter of Breen*, 13 B.R. 965, 969 *supra; In re Duncan*, 35 B.R. 323, 326 *supra*.

Further, we believe that the purpose of excluding from discharge debts obtained by fraud is to protect lenders from dishonest debtors. But the requirement of "reasonable" reliance added to § 523(a)(2)(B)(iii) by the 1978 Code surely does not mean that a creditor may "assume the position of an ostrich with its head in the sand and ignore facts which were readily available to it." *In re Blatz*, 37 B.R. 401, 404–05 (Bankr.E.D. Wis.1984) (quoting *In re Yeiser*, 2 B.R. 98, 101 (Bankr.M.D.Tenn.1979). . . .

Although the court should protect lenders from unscrupulous debtors, it is not our business to bail out any lender no matter how recklessly it gives out its money.

And as one oft-quoted commentator has stated:

A creditor who ignores available information or who fails to seek information from sources that are commonly used, should not be heard to complain about the debtors' fraud. It is the creditor's failing to comport with normal business practices, not the debtor's fraud, that is the final cause of the loss.

Zaretsky, *The Fraud Exception to Discharge Under the New Bankruptcy Code*, 53 Am.Bank.L.J. 253, 262 (1979)

Although the Code requires that the false statement be reasonably relied upon by the creditor before the underlying debt will be declared to be non-dischargeable, the Seventh Circuit Court of Appeals in *In the Matter of Garman*, 643 F.2d 1252, *supra*, has enunciated a liberal standard of reasonableness. *In re Ardelean*, 28 B.R. 299, 301 (Bankr.N.D.Ill.E.D.1983). The *Ardelean*, Court noted that the emerging standard to determine whether the creditor's reliance is reasonable is to compare the creditor's actual conduct to the creditor's own business practices and the standards and customs of the industry, in light of the surrounding circumstances existing at the time the application was made and credit extended. *Id*. at 301. *See also, In re Iverson*, 66 B.R. 219, 229, *supra; In re Harms*, 53 B.R. 134, 141 *supra*.

■ This Court agrees with the *Ardelean* Court that one factor the Court must look to in determining reasonableness of reliance is the creditor's own business practices and standards in the industry but that in keeping with the liberal standard of *In re Garman, supra*, and the analysis of *In re Allen, supra*, this Court holds that the failure of the creditor to verify pursuant to its own credit practices or pursuant to industry standards does not make the reliance unreasonable *per se*.

As pointed out in *In re Iverson, supra*, courts generally do not seek to prescribe procedures for the evaluation of credit-worthiness, but where a creditor's procedure does not comport with industry standards, or where there are warning signals that independent investigation of the debtor's representations are appropriate, the Court may suggest ways to improve the credit evaluation process. *In re Iverson*, 66 B.R. 219, 229 *supra*.

As opposed to the *per se* verification standard of *In Re Breen, supra*, the Court will follow the reasoning in *Matter of Patch*, 24 B.R. 563, 567, 568 *supra*, which held that a departure from practice or custom *could* lead to a finding of unreasonable reliance if the following of standard practices would have provided the creditor with important informations based on the circumstances existing at the time the application was made.

In addition, the standard to be employed in determining the reasonableness of reliance depends in part on the relative sophistication of the parties, the nature of the representation and the ease of conducting an investigation. *In re Furimsky*, 40 B.R. 350, 355 (Bankr.D.Ariz.1984).

Partial reliance on a false representation in connection with an extension of credit has been held to be an adequate basis to prevent discharge of an underlying debt. *Matter of Garman*, 625 F.2d 1252, 1253, n. 1, *supra, citing, Carini v. Matera*, 592 F.2d 378, *supra; In re Sullivan*, 58 B.R. 692, 697 (Bankr.D.Mass.1986); *Matter of Kinney*, 54 B.R. 348, 351 (Bankr.M.D.Fla. 1985); *In re Harms*, 53 B.R. 134, 143 *su-*

*pra.* As stated in *In re Coughlin,* 27 B.R. 632, 637 (B.A.P. 1st Cir.1983).

All that is required is that the financial statement was a "contributory cause of the extension of credit" *American Bank and Trust v. Drewett (In re Drewelt),* 13 B.R. 877, 880 (Bankr.E.D.Pa.1981) (quoting *State Employees Credit Union of Md., Inc. v. Shipley, In re Shipley,* 1 B.,R. 85, 90 (Bankr.D.Md.1979). *In re Ardelean,* 28 B.R. 299, 301, *supra.*

While § 523(a)(2)(B) imposes on the creditor the duty to make reasonable inquiry it does not require the debtor to make all possible inquiries or investigate all possible avenues of investigation and a creditor need not necessarily independently investigate when the information on the application is not the creditor's sole source of the creditor's reliance. For example, when a creditor has had favorable prior dealings with a debtor, and, in consideration of all the circumstances can reasonably expect that the obligation can and will be satisfied, partial reliance on a financial statement is reasonable. *In re Icsman,* 64 B.R. 58, 63 (Bankr.W.D.Ohio 1986).

Thus, where a creditor has knowledge of factors other than the ones set forth on the financial statement which would lead a prudent businessman to reasonably expect he will be able to look to the debtor or the debtor's assets for satisfaction of the debt, then partial reliance on a financial statement can be reasonable and the standard by which reasonable reliance on a financial statement is measured will be lower. *Id.* at 63–64.

However, where the evidence shows, for example, that there was no reliance on the financial statement, but the creditor solely relied on a security interest nondischargeability pursuant to § 523(a)(2)(B) will be denied. *In Matter of Curl,* 64 B.R. 14, 17 and 19, n. 13 (Bankr.W.D.Mo.1986).

The Court now turns specifically to the case at bar and will apply the foregoing principles to the evidence adduced by the parties.

Here, it is clear that the Debtor did not accurately list all of his material obligations outstanding at the time he completed his financial statement to HFC. Only two debts are listed: 1) Lafayette National Bank in the sum of $7,500.00, and 2) Sears for $150.00.

The total debts scheduled by Debtor in his Bankruptcy came to $67,000.00. Not all of the debts scheduled clearly revealed they were in existence on the date of the Debtor's financial statement.

The burden is on HFC to show by clear and convincing evidence that the obligations of the Debtor were in existence on the date the financial statement was given, i.e. March 22, 1985, and were not disclosed on said financial statement.

The Court must take judicial notice of the Debtor's schedules A–2 and A–3, as amended in conjunction with the Debtors testimony to make this determination as HFC produced no independent evidence through other creditors as to who in fact the Debtor owed on March 22, 1984, and the amounts thereof.

The Debtor categorically denied that the indebtedness to St. Elizabeth Hospital scheduled in the sum of $20,602.76 was his debt and this was so indicated on the Debtor's schedules. HFC provided no evidence whatsoever to the contrary on this point and thus this indebtedness must be excluded in the Court's determination as to what debts were in existence on the date of the financial statement.

The Debtor also denied that he was indebted to Beneficial Finance in the sum of $3,100.00 at the time of his financial statement. His schedules do not give a date this indebtedness was incurred. HFC presented no evidence to the contrary and in fact the Associated Credit Report obtained by HFC did not reveal such a debt. The Court will thus not consider the debt in determining what debts were in existence on the date of the Debtor's financial statement.

Finally, the Debtor denied that he owed the Industrial Credit Union in the sum of $7,000.00. This debt was scheduled as incurred on "3/84". Thus, the debt could have been incurred after the March 22, 1984, financial statement. HFC presented

no evidence to the contrary, and in fact HFC's inquiry to Industrial showed no record of any such indebtedness. Therefore, this debt must also be excluded from the Court's consideration of which debts were in fact in existence on the date of the Debtor's financial statement.

The Debtor admitted that the Wilbur Cadwallader and Dennis Pitzer had claims against him in the sum of $10,000.00 and $5,300.00 respectively, but denied these were asserted against him at the time he took out the loan and also denied they arose out of a loan of money but out of a joint venture to invest monies with these individuals that eventually went bad. This was not refuted by any evidence submitted by HFC, and thus will not be considered by the Court as a pre-existing debt for the purposes of this adversary proceeding.

The above debts thus total $48,002.76 which the Court will not find to be in existence at the time of the financial statement based upon the evidence submitted.

■ The Debtor through his schedules of creditors and his own testimony admitted he owed the following creditors at the time of the financial statement which were not set out thereon:

1. Roland Martin—      $12,500.
2. Larry Williams—      $ 3,000.
3. Hippensteel Funeral Home      $ 3,900.

These unlisted debts total $19,400. The total obligations listed by the Debtor on the financial statement, exclusive of a real estate mortgage of $40,000, was $7,150.00. The total amount of debt that was in fact clearly in existence on the date of the financial statement was thus $26,650.00, exclusive of the real estate mortgage.

The explanations given as to why the Debtor did not list these debts are not credible and the debts omitted are material and render the financial statement materially inaccurate.

The Debtor's simple explanations that he "forgot" about the $12,500.00 debt to Roland Williams is simply not believable. The debt was a "balloon" note secured by a second mortgage on his residence, certainly

a major financial transaction for any average consumer or homeowner and not easily overlooked as a default thereon could result in a foreclosure action as to his residence. Even if the Debtor did "forget" this transaction, his failure to advise HFC of that debt was made with such a reckless indifference to the actual facts, and done so carelessly, without examining his available sources of information, so as to constitute actual scienter.

This also holds true as to the $3,000. debt to Larry Williams. The fact that he had "forgotten" about the debt is simply not an acceptable explanation. The financial statement was executed in 1984. The Williams note was signed in 1982. This two year period did not render this obligation to be so stale that any reasonable person who was an average consumer and wage earner would forget its existance. In addition, since it arose out of a commercial transaction rather than being consumer in nature the likelihood of the Debtor forgetting such an obligation is not probable.

Finally, the Debtor admitted he executed a $3,900. note to the Hippensteel Funeral Home in August of 1984. This was only seven months prior to the financial statement, and the fact he felt it might be paid by insurance was no excuse for not listing the same so HFC could properly evaluate how it might impact on his ability to repay the loan. The fact that the Debtor thought the debt would be paid by insurance did not justify its concealment. HFC should have been given the opportunity to make its own independent evaluation as to whether it was likely said debt would be in fact paid by insurance. The Debtor cannot secretly classify and disclose only those debts he thinks important in his own mind.

■ Having found the financial statement was materially false and made with an intent to deceive, the Court next turn to the issue of whether HFC reasonably relied thereon.

HFC clearly showed that it followed its own internal procedures and acted reasonably in attempting to independently verify the accuracy of the information provided to it by the Debtor.

HFC did everything that could reasonably be expected of it under the circumstances to independently investigate the Debtor's employment, background, outstanding obligations and credit record. It required the Debtor initially to orally provide all relevant outstanding debts and a credit bureau check was done. This was compared with the verbal statement given by the Debtor and inquiries were made to those creditors shown on the credit report who had made inquiries about the Debtor with the exception of two small judgments which HFC considered in its evaluation. The credit report was consistent with the Debtor's oral statement as to his debts and showed an "outstanding" credit record.

Unfortunately, the obligations that the Debtor failed to list were with private lenders rather than institutional or commercial lenders, and thus they were not capable of being ascertained through HFC's normal credit-checking process unless the Debtor voluntarily divulged their existence. Based on the foregoing the Court finds that HFC's reliance on the Debtor's financial statement was reasonable.

The loan was unsecured and there were no guarantors thereof. HFC had no prior experience with HFC and so it did not have access to prior financial statements or credit history regarding the debtor. Accordingly, HFC was relying entirely on the Debtor's credit worthiness as reflected in the information provided by him to HFC including the financial statement in making this loan.

The Court therefore holds that the indebtedness of the Debtor to HFC is excepted from the Debtor's general discharge in Bankruptcy pursuant to 11 U.S.C. § 523(a)(2)(B).

The Court finds that no evidence was presented as to the exact amount of the accrued interest and principal due by the Debtor to the Plaintiff on the date of the Debtor's petition, nor was any evidence submitted as to the attorney's fees incurred by the Plaintiff, although the Plaintiff prayed for attorney's fees pursuant to Bankruptcy Rule 7008(b). HFC's sole witness did testify that $3,035.48 in actual monies were lent by HFC to the Debtor and only one $90.00 payment was made. Thus, the Court has no alternative based on the record but to limit the Plaintiff's damages to $2,945.48 ($3,035.48 less one $90.00 payment).

It is therefore,

ORDERED, ADJUDGED, and DECREED that the indebtedness of the Debtor to HFC is nondischargeable in the Debtor's bankruptcy. And it is further

ORDERED, ADJUDGED and DECREED that the Plaintiff have judgment versus the Debtor in the sum of $2,945.48, and its costs.